IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 04-00883-CV-W-REL |
| v. | ) ) | |
| MIDWEST DIVISION - RMC, LLC, d/b/a RESEARCH MEDICAL CENTER, | ) ) ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the court is Defendant's motion for summary judgment on the grounds that: (1) Ms. Banks is not a qualified individual as defined by the Americans with Disabilities Act ("ADA"); (2) Defendant fulfilled its duty to participate in the interactive process in good faith, whereas Ms. Banks did not; and (3) Plaintiff cannot reconcile Ms. Banks' inconsistent representations of disability to the Social Security Administration and for purposes of the instant case. I find that genuine issues of material fact exist regarding whether (1) Ms. Banks could have been accommodated by adaptive equipment, (2) Defendant engaged in the interactive process in good faith while investigating adaptive equipment possibilities, (3) Ms. Banks participated in the interactive process in good faith throughout the adaptive equipment investigation, and (4) Ms. Banks made inconsistent statements about her disability. There are no disputed facts on the issues of whether (1) Ms. Banks could have been accommodated by reassignment and (2) the respective parties

exercised good faith during the interactive process when considering the possibility of reassignment. Therefore, Defendant's motion for summary judgment is granted in part and denied in part.

## I.    BACKGROUND

On October 14, 2004, Plaintiff filed its First Amended Complaint against Defendant. The complaint was filed on behalf of Jotina Banks, alleging a violation of the ADA. Plaintiff specifically alleges that Defendant did not reasonably accommodate Ms. Banks' disability, vision impairment, and removed her from the work schedule because of this disability.

On March 31, 2006, Defendant filed a motion for summary judgment and suggestions in support (Doc. No. 93). Plaintiff filed suggestions in opposition on May 3, 2006 (Doc. No. 44). On May 22, 2006, Defendant filed reply suggestions to its original motion (Doc. No. 105).

## II.    STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if: (1) there is a dispute of

fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. Am. Acad. of Family Physicians v. United States, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), aff'd 91 F.3d 1155 (8th Cir. 1996). The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. Disesa v. St. Louis Cmty. Coll., 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. Anderson, 477 U.S. at 248. Factual disputes that are collateral to the substantive law will not preclude summary judgment. Id.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine. A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. Id. at 249. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Id. at 255. If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted. Id. at 249-50.

3

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. Id. at 323. If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248. The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

### III.    UNCONTROVERTED FACTS

Below, typed in bold, are the facts offered by Defendant that I find to be uncontroverted by the record before me.

1.    **On March 19, 2001, Banks began working for Research as a full-time unit secretary assigned to the fourth floor cardiac telemetry department, known as 4 East.**

Plaintiff does not dispute this fact.

2.    **Unit secretaries respond to the patient call system which entails notifying the appropriate individuals when a patient needs medical attention by reading "call lights" with small numbers that identify the room in which the patient in need of attention is staying.**

4

Plaintiff does not dispute this fact.

3. **Unit secretaries transcribe handwritten doctors' orders and must be completely accurate with such orders.**

Plaintiff does not dispute this fact.

4. **Unit secretaries are in charge of processing documents like patient charges, medical records, doctors' orders and other forms. The secretary must know where each form is and be able to fill out each form accurately.**

Plaintiff does not dispute this fact.

5. **Unit secretaries create patient charts by inputting information recorded on the patient board into the computer.**

Plaintiff does not dispute this fact.

6. **Unit secretaries sort and count medication.**

Plaintiff does not dispute this fact.

7. **Unit secretaries order unit supplies which entails reading small writing on medications and medical equipment.**

Plaintiff does not dispute this fact.

8. **Unit secretaries transport samples of blood and bodily fluids.**

Plaintiff does not dispute this fact.

9. **Banks had no difficulty performing her job as a full-time unit secretary on 4 East.**

Plaintiff disputes this fact.

5

In support of this fact, Defendant cites page 82, lines 16-19, of Ms. Banks' deposition:

> Q:     Did you have any difficulty performing your job as a unit secretary in the cardiac telemetry department?
> A:     No.

Plaintiff does not dispute that Ms. Banks believed she performed the functions of the 4 East unit secretary job without difficulty and that she met expectations in that position. Plaintiff seems to dispute whether Ms. Banks actually had difficulty, however, stating that she had to supply her own hand-held magnifier and special 20/20 pen in order to perform her 4 East and float pool unit secretary duties. The testimony cited by Plaintiff relates to Ms. Banks not feeling safe working on 4 East after a co-worker threw a 9-volt battery at her (Plaintiff's Exh. 1, 88:2-15, 91:19-93:3) and Ms. Banks receiving warnings about her absenteeism (Plaintiff's Exh. 1, 97:10-16, 99:2-14). Furthermore, Plaintiff cites testimony from Ms. Banks' deposition in which she stated she was able to perform her job with glasses, a magnifying glass, and a 20/20 pen in July of 2002 (Plaintiff's Exh. 1, 275:5-7); she did not request magnification equipment until October of 2002 (Plaintiff's Exh. 1, 113:21-114:11). Given the fact that Ms. Banks only worked as a full-time secretary on 4 East until August 5, 2002, this testimony does not controvert Defendant's proposed fact that Ms. Banks could perform her job without difficulty. I, therefore, find this fact to be uncontroverted.

10.     **On July 16, 2002, Banks gave her supervisor three weeks notice that her last day on 4 East would be August 5, 2002.**

6

Plaintiff does not dispute this fact.

11.    **Unbeknownst to Research, beginning in February 2002, while Banks still worked on 4 East, Banks began receiving vocational rehabilitation services from Daniel Fischer at the Missouri Department of Social Services, Family Support Division, Rehabilitation Services for the Blind.**

Plaintiff does not dispute this fact.

12.    **In April 2002, Banks informed Fischer that she was having difficulty reading patient charts and viewing her computer screen at work.**

Plaintiff does not dispute this fact.

13.    **In July 2002, Banks told Fischer that she continued to experience such difficulties.**

Plaintiff does not dispute this fact.

14.    **Despite Fischer's repeated encouragement to do so, Banks did not discuss her visual barriers with Research for approximately the first eight months he worked with her.**

Plaintiff disputes this fact.

In support of this proposed fact, Defendant cites excerpts from Ms. Banks' deposition, as well as an affidavit from Daniel Fischer. Mr. Fischer's affidavit states:

For approximately the first eight months I worked with her, Ms. Banks reported she did not discuss her visual barriers with RMC[1] despite

_____

[1]"RMC" denotes "Research Medical Center."

7

my repeated encouragement for her to do so. Based on my narratives during the first eight months we worked together, Ms. Banks would not allow me to contact RMC and she instructed me not to release her medical records to RMC. I informed Ms. Banks that if I could not communicate with her employer, I could not assist her in obtaining visual aids for work. Ms. Banks signed a release allowing me to communicate with RMC, yet she continued to instruct me not to contact RMC and not to provide RMC with her medical records.

(Defendant's Exh. 5, ¶ 4). The testimony from Ms. Banks' deposition cited by Defendant

states, in relevant part, that Mr. Fischer began encouraging Ms. Banks to talk to her

employer as early as June of 2002 (Defendant's Exh. 1, 152:8-153:2).

The evidence cited by Plaintiff does not controvert this proposed fact. To the

contrary, Plaintiff's evidence demonstrates that Mr. Fischer began working with Ms.

Banks in February of 2002, and encouraged Ms. Banks to speak with her employer on

more than one occasion (i.e., via conversation on or after June 13, 2002; by letter on sent

on or after June 25, 2002; and through a personal conversation on September 20, 2002)

(Plaintiff's Exh. 3). Because I interpret Defendant's proposed fact to mean that Mr.

Fischer had worked with Ms. Banks for eight months prior to the time she ultimately

spoke to her employer, rather than that Mr. Fischer encouraged Ms. Banks to speak to her

employer for eight months before she did so, I find this fact to be uncontroverted.

15.     **Further, Banks instructed Fischer not to communicate with Research**

**regarding her need for adaptive equipment.**

Plaintiff disputes this fact.

8

In support of this fact, Defendant again cites the fourth paragraph of Mr. Fischer's affidavit:

> For approximately the first eight months I worked with her, Ms. Banks reported she did not discuss her visual barriers with RMC despite my repeated encouragement for her to do so. Based on my narratives during the first eight months we worked together, Ms. Banks would not allow me to contact RMC and she instructed me not to release her medical records to RMC. I informed Ms. Banks that if I could not communicate with her employer, I could not assist her in obtaining visual aids for work. Ms. Banks signed a release allowing me to communicate with RMC, yet she continued to instruct me not to contact RMC and not to provide RMC with her medical records.

(Defendant's Exh. 5, ¶ 4).

Plaintiff disputes this fact, citing paragraph nine of Mr. Fischer' verified statement and accompanying case log entries. Mr. Fischer's July 8, 2002, log entry states that Ms. Banks did not want him to speak with her employer. The September 20, 2002, entry mentions Ms. Banks "was hesitant to discuss her visual barriers with her employer." In his verified statement, Mr. Fischer states:

> According to my narrative entry dated October 18, 2002, (Bates #001769), on October 18, Ms. Banks reported that she continues to have employment barriers due to her visual condition and that she had talked with her new boss, but that nothing has changed. I encouraged Ms. Banks to have her employer contact RSB[2] to assess if magnification to her computer screen would benefit her. Ms. Banks signed an authorization form allowing her employer and RSB to explore a job analysis once her employer approved it.

(Plaintiff's Exh. 3, ¶ 9).

_____

[2]"RSB" denotes "Rehabilitation Services for the Blind."

9

Again, I do not interpret Defendant's proposed fact to mean that for a period of eight months, Ms. Banks would not allow Mr. Fisher to discuss her need for adaptive equipment with Research. Instead, I read the proposed fact to mean that Mr. Fischer began working with Ms. Banks in February of 2002, and Ms. Banks did not execute the authorization until October of 2002, approximately eight months later. This fact is uncontroverted.

16.  **In June 2002, Fischer informed Banks that he could not assist her with obtaining visual accommodations unless he could communicate with Research.**

Plaintiff does not dispute this fact.

17.  **Banks continued to instruct Fischer that he was not to communicate with Research regarding her need for adaptive equipment.**

Plaintiff disputes this fact.

In support of this proposed fact, Defendant cites paragraph four of Mr. Fischer's affidavit:

> For approximately the first eight months I worked with her, Ms. Banks reported she did not discuss her visual barriers with RMC despite my repeated encouragement for her to do so. Based on my narratives during the first eight months we worked together, Ms. Banks would not allow me to contact RMC and she instructed me not to release her medical records to RMC. I informed Ms. Banks that if I could not communicate with her employer, I could not assist her in obtaining visual aids for work. Ms. Banks signed a release allowing me to communicate with RMC, yet she continued to instruct me not to contact RMC and not to provide RMC with her medical records.

(Defendant's Exh. 5, ¶ 4).

Plaintiff disputes this fact, citing paragraph nine of Mr. Fischer's verified statement and accompanying case log entries. Mr. Fischer's July 8, 2002, entry establishes that Ms. Banks told him she did not want him to speak with her employer on June 13, 2002. His September 20, 2002, entry mentions Ms. Banks "was hesitant to discuss her visual barriers with her employer." Mr. Fischer's statement establishes that Ms. Banks "signed an authorization form allowing her employer and RSB to explore a job analysis once her employer approved it" on October 18, 2002. (Plaintiff's Exh. 3, ¶ 9).

These two entries indicate that after Ms. Banks initially instructed Mr. Fischer not to speak with Research on June 13, 2002; she again failed to give him permission to do so on September 20, 2002. Although Ms. Banks ultimately signed an authorization on October 18, 2002, the fact that she would not allow Mr. Fisher to talk to Research on two prior occasions is enough to find that she "continued" to instruct Mr. Fisher not to speak to her employer about adaptive equipment. I find this proposed fact to be uncontroverted.

18. **In late June 2002, Fischer told Banks that because she had been employed full time since 2001, her case file with Rehabilitation Services for the Blind would be closed on July 8, 2002.**

Plaintiff does not dispute this fact.

19. **In July 2002, while working on 4 East, Banks applied for Social Security disability benefits.**

11

Plaintiff does not dispute that Ms. Banks applied for Social Security disability benefits on July 3, 2002.

20.    **On her application for benefits, Banks represented that she "became unable to work because of [her] disabling condition on March 1, 2000."**

Plaintiff does not dispute this fact.

21.    **The disabling condition that rendered Banks "unable to work" as of March 2000 was that she was "blind in [her] left eye and [her] right eye [was] having decreased vision."**

Plaintiff does not dispute this fact.

22.    **On her Social Security disability application, Banks wrote, "It is very difficult to see what I am doing. I have to ask a lot of questions. Sometimes I am scared that I might put the wrong thing down."  Banks also wrote on the application that her doctor told her no type of corrective eyeglasses would help.  At the time Banks filled out the application, "seeing was difficult, very challenging."**

Plaintiff does not dispute this fact.

23.    **By "putting the wrong thing down," Banks was referring to reading and transcribing doctors' handwritten orders which included directions on patient care, the kind of medication a patient was supposed to receive, and the kinds of tests to be run on a given patient during their stay at the hospital.**

Plaintiff does not dispute this fact.

24.    **Banks first explained that she was scared she would put the wrong thing**

12

down regarding her transcription of doctors' orders, because she "didn't have no magnifiers at the time."

Plaintiff does not dispute this fact.

25.     However, in response to being asked if she was concerned that she put down the wrong thing on medication and doctors' orders, Banks then said that she did have "the magnifiers, and the nurses always checked everything off.  And I was asked a lot of questions."

Plaintiff does not dispute this fact.

26.     Banks had to "ask a lot of questions" because "[her] eyes were getting bad, and [she] didn't know what was going on.  And [she] asked questions to make sure that she didn't make any mistakes."

Plaintiff does not dispute this fact.

27.     Banks does not believe that she read the following clause, which appears on the Social Security disability application, before signing her application:

> I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law by fine, imprisonment or both.

Plaintiff does not dispute this fact.

28.     Banks states that the representation made on her July 2002 Social Security application that she had been completely unable to work since March 2000, is true and accurate.

Plaintiff does not dispute this fact.

29. **Banks is "not sure why" she chose March 2000 as the date of onset of her condition.**

Plaintiff disputes this fact, stating that Ms. Banks knew why she put the year 2000 on her application but did not know why she chose March of 2002.

In support of this fact, Defendant cites page 270, line 4 through page 276, line 25, of Ms. Banks' deposition testimony. Ms. Banks testified, in relevant part, as follows:

> Q: And in both the applications you filed with the federal government claiming you were unable to work, you claimed you were unable to work from March 2000. Right?
> A: In March 2000?
> Q: Right.
> A: That's the date they told me to put on the application.
> Q: Who told you to put that date on the application?
> A: Social Security.
> Q: Who at Social Security?
> A: I don't remember the name.
> Q: Did they tell you why to put that date?
> A: Said I had to go back so many years or so.
> Q: I'm a little confused here. So you're saying you were able to work in July 2002 just with the equipment you had yourself, glasses and a magnifying glass?
> A: At that time, yes.
> Q: So at the time you signed an application with the federal government swearing that you were totally unable to work, you were actually able to do the work?
> A: I was able to work with the adapted equipment that I had until my vision worsened even worser.
> Q: So in July 2002, you were able to work by wearing glasses and using a magnifying glass.
> A: And the 20/20 pen. Yes.
> Q: You didn't tell the federal government that, did you?
> A: I don't remember.

.   .   .

14

Q:     Were you being truthful when you applied for Social Security
       disability benefits in December 2002?
A:     Yes, I was.
Q:     And in that application you swore that you were unable to work
       from March 2000 forward.  Correct?
A:     That's the date they told me to put down.
Q:     Okay.  And was that truthful?
A:     2000, I believe that was when my condition started, I believe.
Q:     What condition?
A:     I'm not quite sure, but - -
Q:     You're not quite sure what condition started in 2000?
A:     I believe it was my eye condition.  But when I was down there, she
       told me to put down a date of an onset of my condition.
Q:     And you chose the date of March 2000?
A:     Yes.
Q:     Okay.  And why did you choose the date of March 2000?
A:     I'm not sure why.

(Defendant's Exh. 1, 274:3-276:25).

Plaintiff cites to portions of this same testimony to dispute Defendant's proposed

fact.  While this testimony establishes Ms. Banks chose "2000" for an alleged onset date

because she believed her condition started that year, it also clearly establishes that

Plaintiff testified she was unsure why she listed "March 2000" on her Social Security

application.  I find this fact to be uncontroverted.

30.    While she was working as a full-time unit secretary on 4 East, **Banks learned**

**that she did not qualify for Social Security disability benefits. The benefits were**

**denied because Banks was working over the allowable limit for receiving Social**

**Security disability payments.**

Plaintiff disputes this fact.

15

In support of this fact, Defendant cites a portion of Ms. Banks' deposition testimony:

Q: Do you remember getting a letter dated July 5th, 2002 from the Social Security Administration saying you do not qualify for Social Security disability benefits?

A: I had went down there, and they told me about the letter.

Q: When did they tell you that?

A: Oh, it was a period after that.

Q: Was it shortly after you signed the application?

A: I didn't know that they denied it until - - it was quite some time then I found out that [sic] was denied.

Q: Did you actually go down to the Social Security office and fill out the application there?

A: Yes, I did.

Q: What office? Where was the office located?

A: At the time, it was off 63rd and Troost.

Q: And when you filled out the application, did you turn it in right away to somebody at the Social Security office?

A: Yes, I did.

Q: Did somebody look at it and tell you whether or not you were likely to get your benefits?

A: No, they didn't.

Q: Did someone at that office tell you sometime after you filed your application that you would not qualify for Social Security because of your work and how much you earned?

A: I later found that out.

Q: Do you remember when you found it out?

A: No, I don't.

Q: Do you remember how much after you filed your application for benefits on July 3, 2002 that you found out your benefits were going to be denied because you were working over the limit for Social Security disability payments?

A: I later found that out.

Q: Do you remember how much later? Was it days or - -

A: It was months later.

Q: Months?

A: Yes.

Q: Do you remember why you went into the Social Security office to ask about it?

16

| A: | Because I never received a letter in the mail. |
|---|---|
| Q: | You got the letter at some point.  Correct? |
| A: | No, I didn't. |
| Q: | You never got it? |
| A: | No. |
| Q: | You just went down to the office and - - do you know who you talked to? |
| A: | No, I don't. |
| Q: | Were you still working as a unit secretary on 4 East when you went to the Social Security office and found out you were being denied benefits? |
| A: | I probably was getting ready to go to the float pool at the time. |

(Defendant's Exh. 1, 129:2-131:12).

Plaintiff disputes this fact, relying on the testimony that Ms. Banks did not learn that social security benefits were denied when she was getting ready to work in the float pool.  It is unclear from the cited evidence whether the time during which Ms. Banks worked on 4 East and the time she was getting ready to go to the float pool are mutually exclusive.  I, therefore, find only the portion of this statement typeset in bold to be uncontroverted.

31.     **Banks began looking for an open daytime position at Research while she was working on 4 East. Banks consulted Research Human Resources personnel about possible positions and called the job line each week so she could hear about open positions.**

Plaintiff does not dispute this fact.

32.     **As part of her search for open positions, Banks did not review the job listings because she could not see the listings.**

17

Plaintiff does not dispute this fact.

33.    **Banks was aware that she could apply to transfer to an open position.**

Plaintiff does not dispute this fact.

34.    **During this time, the only position for which Banks applied was the float pool PRN position.**

Plaintiff does not dispute this fact.

35.    **Banks was told by Research supervisor, Lois Henderson, that she could not transfer to another position automatically. Henderson told Banks that to transfer to another position, Banks needed to fill out a transfer application.**

Plaintiff does not dispute this fact.

36.    **Banks filled out the transfer application herself and identified the position she desired as Research Medical Float Pool, Unit Secretary PRN.**

Plaintiff does not dispute this fact.

Plaintiff further states that the position did not even exist when Ms. Banks first talked to Ms. Henderson, so Ms. Henderson requisitioned management to create the position for Ms. Banks.

37.    **When Banks applied for the transfer, she was specifically seeking an on-call or PRN position, as opposed to a full-time position, and was aware that she would be working only when she was needed.**

Plaintiff disputes this fact.

18

In support of this proposed fact, Defendant cites Ms. Banks' transfer application that states she was seeking a position in Research Medical Center's Float Pool as a Unit Secretary on an as-needed basis (Defendant's Exh. 6). It also cites testimony from Ms. Banks' deposition where she acknowledged that her status as "PRN" meant she "worked as needed" (Defendant's Exh. 1, 105:13-15).

Plaintiff cites portions of Ms. Banks' deposition to contradict this fact. However, the testimony cited merely states that Ms. Banks applied for the float pool secretary position on an as-needed basis for scheduling purposes:

> Q: But I take it you didn't apply to transfer to any position while you were on 4 East, except the unit secretary for the float pool PRN. Correct?
> A: Right.
> Q: Were there just not any positions available?
> A: At the time there wasn't [sic] any available that would suit my needs, and I could work PRN and still keep, like, full-time hours.
> Q: Okay. When you say there weren't any other positions that would suit your needs, what did you mean? As - - what would suit your needs?
> A: Well, they [sic] were other positions like 8:00 to 5:00, but it was like Monday through Friday. And the position I was looking for was, like, 12-hour shifts, but I could also be off during some days of the week also.
> Q: So you wanted 12-hour shifts during the day?
> A: Sometimes more, yes.
> Q: Why?
> A: Because I was used to working 12-hour shifts.
> Q: Okay. But you had been working 12-hour shifts at night?
> A: Before I became a unit secretary during the day and then I was trained for PCT position/secretary, I went to nights working.

19

(Plaintiff's Exh. 1, 94:10-95:16). As demonstrated by this excerpt, Ms. Banks did, in fact, apply for an "as-needed" position. This testimony merely explains that she did so in order to be able to keep full-time hours. This fact is uncontroverted.

38. **Banks testified that, at the time she applied for this position, she was not aware of any reason why she would be unable to perform the essential functions of this position.**

Plaintiff does not dispute this fact.

39. Banks quit her full-time position on 4 East to work as a float pool unit secretary on an as-needed ("PRN") basis ("float pool PRN").

Plaintiff does not dispute Ms. Banks transferred from unit secretary on 4 East to unit secretary in the float pool; however, it disputes that she "quit" her position on 4 East.

In support of this proposed fact, Defendant cites page 87, lines 21-23 of Ms. Banks' deposition:

Q: Why did you quit your position on 4 East as a unit secretary?
A: To work in the float pool PRN.

Plaintiff cites portions of testimony from the depositions of Ms. Banks, Ms. Waters and Ms. Frazier that all, respectively, demonstrate Ms. Banks did not quit her position, but rather applied for a transfer from her position as a unit secretary on 4 East to the float pool on an as-needed basis. Therefore, I find this fact to remain controverted.

40. Among the reasons that **Banks** quit her full-time position on 4 East was that she **wanted to work days instead of nights**.

Plaintiff does not dispute that Ms. Banks wanted work days instead of nights, but disputes that Ms. Banks quit her employment with Defendant. For the same reasons as those explained in response to Defendant's proposed fact number forty, above, I find only the portion of this proposed fact typeset in bold to be uncontroverted.

41.     **When Banks began working as a float pool unit secretary, Banks would provide to Research the days and hours she was willing to work and then Research would schedule her to work, as needed, during the hours she provided.**

Plaintiff does not dispute this fact.

42.     **Banks understood that the hours she worked would vary from week to week.**

Plaintiff does not dispute this fact.

43.      **Banks' idea of PRN was working whenever she wanted to work.**

Plaintiff does not dispute this fact.

44.     **Banks was told by Henderson that her hours needed to meet Research's needs, and that full-time and part-time employees are used to fill Research's needs before on-call/PRN employees, like Banks.**

Plaintiff does not dispute this fact.

45.     **As a float pool unit secretary, Banks could be stationed at any one of the hospital's ten or more unit secretary stations.**

Plaintiff does not dispute this fact.

46.     **In** early **September 2002, Banks informed Fischer that she had transferred to**

21

**part-time on-call status. Banks' case file with Rehabilitation Services for the Blind was reopened at this time.**

Plaintiff disputes this fact.

In support of this proposed fact, Defendant cites Mr. Fischer's affidavit:

> In late June 2002, I informed Ms. Banks that because she had maintained full-time employment since 2001, her Rehabilitation Services for the Blind case file would be closed in July 2002. In early September 2002, Jotina called to inform me that she had moved to part-time on-call status with her employer, Research Medical Center ("RMC"). Ms. Banks' case file was reopened at that time.

(Defendant's Exh. 5, ¶ 3).

Plaintiff disputes this fact through the log entries attached to Mr. Fischer's verified statement. The September 20, 2002, entry reads:

> In early September, 2002, VRC Fischer received a call from consumer requesting magnifiers for reading documents. With DS Wright's approval, the evaluation was scheduled with Mary Fowler-Hock, Rehabilitation Teacher. Today, I sat in the evaluation. Ms. Banks reported she is having problems with her employment and was moved to a PRN status. I encouraged her to talk with her employer regarding her difficulty viewing the computer screen. I previously recommended that she ask the employer to contact RSB to explore a job analysis to identify if work station modifications could be identified to improve her job functions. However, this has not occurred. Hand[-]held magnifiers will be ordered; however, Ms. Banks was hesitant to discuss her visual barriers with her employer as she "did not want co-workers to know her business". Until her employer and her communicate and request RSB involvement, the case file will not be re-opened in vocational post[-]employment status. Case file will be opened into ILS status.

(Plaintiff's Exh. 3).

22

This entry states Ms. Banks told Mr. Fischer of the change in her employment status on September 20, 2002, thus controverting the portion of the proposed fact that she did so in "early" September. I find the remainder of this fact, typeset in bold above, to be uncontroverted.

47. **On or about September 20, 2002, Banks told Fischer that she was having problems with her employment.**

Plaintiff does not dispute this fact.

48. **Fischer again encouraged Banks to talk to Research about her visual difficulties.**

Plaintiff does not dispute this fact.

49. **In late October 2002, Banks informed Lois Henderson that she was concerned she could no longer do her job without adaptive equipment.**

Plaintiff does not dispute this fact.

50. **After having this conversation with Henderson, Banks was sent home after she arrived for a scheduled work shift and told her supervisor that she could no longer see her computer screen to do her job without adaptive equipment.**

Plaintiff does not dispute this fact.

51. **"Shortly thereafter," Banks became completely unable to read a document, even with the aid of magnification equipment.**

Plaintiff does not dispute this fact, but further states that by "shortly thereafter," Ms. Banks meant "within months."

23

52.    **Banks became completely unable to see, even with magnification, "several months" after October 2002.**

Plaintiff does not dispute that Ms. Banks became unable to see with the aid of hand-held magnifiers or CCTV magnification sometime after May of 2003.

In support of this fact, Defendant cites three excerpts from Ms. Banks' deposition which read, in relevant part:

> Q:    Okay.  But you said after several months, several months after
>        October 2002, you became unable to see completely.  Correct?
> A:    Yes.
> Q:    So in early 2003, you'd be unable to see even if you got up close.
>        Correct?
> A:    Yes.

(Defendant's Exh. 1, 134:23-135:4).

> Q:    You could possibly enlarge the forms so they could be filled out
>        with a larger pen.  Correct?
> A:    Yes.  Or a magnifier.
> Q:    Okay.  But that wouldn't work if your eyesight is so bad you can't
>        see even with a magnifier, would it?
> A:    There's devices I could have used.
> Q:    Okay.  Back in October 2002.  Right?
> A:    Yes.
> Q:    But you said within a few months of that, you became unable to
>        see a form even with the use of a magnifier.  Correct?
> A:    Yes.

(Defendant's Exh. 1, 137:15-138:2).

> Q:    Okay.  But within a few months of October 2002, you said you
>        couldn't see to read a form even with magnification.  Correct?
> A:    Right.

(Defendant's Exh. 1, 114:6-9).

24

Plaintiff also cites portions of Ms. Banks' deposition testimony to controvert this proposed fact:

Q:  Do you remember telling Dr. Patricia Murray that when you saw her in March 2003 you had lost quite a bit of vision in the last two to three years?

A:  Yes.

Q:  Did you tell Dr. Murray that by March 2003 you were completely unable to read, even with magnification equipment?

A:  The magnification equipment I was talking about was the hand magnifiers.

Q:  What do you mean the magnification equipment you were talking about?

A:  I didn't have a CCTV at the time.  Only had a hand magnifiers [sic] that I was using at Research.  And I could not use those no longer.

Q:  Okay.  I'm talking about March 2003.  It was October 2002 when you talked to Miss Henderson first about the fact that you could no longer see to do your job without some kind of special equipment.  Correct?

A:  Yes.

Q:  So in March 2003 - - and you told me yesterday that within a couple of months after October 2002, you were completely unable to see.  Couldn't read with any kind of magnification equipment.  Correct?

A:  I could have used something, but I didn't know it was out there at the time.

Q:  Okay.  So you're telling me today that you could read - - can you read today with some kind of equipment?

A:  Probably not today, no.

Q:  Now, when - - today, if I ask you today, "When did you stop being able to read, even with special equipment," what will you tell me?

A:  I'd have to say - - probably say 2003.  Because at the time she gave me a CCTV, and I could use something - - I could see something real good with that.

                    .    .    .

Q:  Are you able to tell us when you became completely blind so that you couldn't read a document, even with any magnification equipment that exists?

A:  I couldn't give you an exact date, no.

Q:  Can you tell me anything, other than 2003?

25

A:    No.

(Plaintiff's Exh. 1, 239:6-241:13).

Q:    Okay. When did you become unable to read this document, even
       with any adaptive equipment you're aware of?
A:    I'd say that would have had to have been - - that I'm aware of, by
       any magnifications or adaptive equipment or CCTVs, I'd have to
       say probably like after 2003.

(Plaintiff's Exh. 1, 259:11-14).

Q:    And do you recall meeting with Rita Mil[l]ner in early May 2003?
A:    Yes.
Q:    And was it your belief at that time that you could still read with
       CCTV magnification?
A:    Yes.
       MS. KOCH:    Object to the form of the question as leading and
                             misstating prior testimony.
A:    Yes.
Q:    (By Ms. Stith) Was it some point after, that early May meeting
       with Ms. Mil[l]ner that you concluded you could no longer read
       with any kind of magnification?
       MS. KOCH:    Object to the form of the question - -
A:    Yes.
       MS. KOCH:    - - as leading and misstating the witness's prior
                             testimony.
A:    Yes.
Q:    (By Ms. Stith) Do you remember - -
A:    I don't remember the exact date.
Q:    Let me finish my question. Do you remember when in 2003?
A:    No.

(Plaintiff's Exh. 1, 282:9-283:6).

The testimony cited by both Defendant and Plaintiff, respectively, is not

inconsistent. Each of the above-listed excerpts demonstrate that Ms. Banks became

completely unable at some point in 2003. Even if it occurred as late as May of 2003, as

26

suggested by Plaintiff, such time would still be considered "'several months' after

October 2002" as Defendant proposed.  I, accordingly, find this fact to be uncontroverted.

53.     **When Banks informed Research of her visual impairment, Banks' direct**

**supervisor, Lois Henderson, encouraged Banks to apply for** paid **time off under the**

**Family Medical Leave Act ("FMLA").  Banks declined to apply for FMLA leave**

**because she "wasn't sick" and "didn't see a reason to apply for it."**

Plaintiff disputes the portion of the fact that describes leave under the Family

Medical Leave Act as "paid time off."

The portion of Ms. Banks' deposition testimony cited both by Defendant in

support of this proposed fact and by Plaintiff to controvert this fact is as follows:

> Q:     Do you remember Miss Henderson talking to you about taking
> FMLA leave?
> A:     Yes.
> Q:     Do you remember what you said to her when she encouraged you
> to apply for FMLA leave?
> A:     I told her that I wasn't sick, that my disability was not going
> anywhere.
> Q:     So you told her you didn't want to apply for FMLA leave.  Right?
> A:     I wasn't sick.
> Q:     Okay.  So did you tell her you didn't want to apply for FMLA
> leave?
> A:     I didn't see a reason to apply for it.
> Q:     Do you remember what Miss Henderson said to you about why you
> should apply for FMLA leave?
> A:     No, not quite.
> Q:     Do you remember any conversations you had with Lois Henderson
> in 2003?
> A:     The conversations I had with her was mainly it's working, get on
> the schedule, what was being done for me to get on the schedule
> and why is it taking so long.

27

| Q: | Okay.  Do you remember anything Miss Henderson said to you in 2003? |
|---|---|
| A: | She did mention something about, "You're blind.  We've been over this multiple times."  You know, something about I couldn't do the work.  But - - |
| Q: | Do you remember telling Miss Henderson in October 2002 that you were concerned because you could no longer see to do your job unless you got some kind of adaptive equipment? |
| A: | I told her that I could benefit from it.  Therefore, I can do my job. |
| Q: | Do you remember telling her that you were concerned that you could no longer do your job without that adaptive equipment? |
| A: | Yes. |
| Q: | And do you remember coming to work after having that conversation with Miss Henderson and telling your supervisor that you could not see the computer screen and being sent home because of that? |
| A: | Yes. |

(Defendant's Exh. 183:22-185:13).

Plaintiff is correct; the relevant testimony does not reflect that Ms. Henderson

encouraged Ms. Banks to apply for "paid time off."  As a result, only the portion of this

fact typeset in bold will be considered uncontroverted.

54.    **In November 2002, Research began working with Fischer to identify possible**

**job accommodations for Banks.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites Mr. Fischer's affidavit:

After I spoke with RMC in November of 2002, I learned that Ms. Banks'
on-call position required her to work at ten or more different work
stations.  I informed RMC that Rehabilitation Services for the Blind would
not be able to provide modifications to multiple work stations.  Ms. Banks
told me RMC subsequently proposed a full-time housekeeping position to
Ms. Banks, but Ms. Banks was unwilling to consider the position because

28

she did not believe she could perform the job functions as, per her self-evaluation, she was "going blind."

(Defendant's Exh. 5, ¶ 5).

Plaintiff attempts to dispute this proposed fact by citing evidence that sets forth a time line of Mr. Fischer's interactions with Research. Although more specific, the evidence cited by Plaintiff is not inconsistent with Research beginning to work with Mr. Fischer in November of 2002, as proposed by Defendant. This fact is uncontroverted.

55. Because float pool unit secretaries work at all the various unit secretary stations at Research, any adaptive equipment provided for Ms. Banks would need to be installed at every single station in order to accommodate her as a float pool unit secretary.

Plaintiff disputes this fact.

In support of this fact, Defendant cites Ms. Banks' deposition transcript, which reads, in relevant part:

> Q:    Okay. And if you were a floating unit secretary, you'd have to have Braille room indicators at every single station. Correct?
> A:    Yes.
> Q:    And if you put an audible program for your computer that would tell you each nurse's code and you were a floating unit secretary, you'd have to have an audible program at every unit secretary's station in the hospital. Correct?
> A:    Just where I'd be working at.
> Q:    Right. And if you're a floater, you could be at any unit secretary's station in the hospital. Correct?
> A:    Yes.
> Q:    Paper processing was a task associated with being a unit secretary. Correct?
> A:    Yes.

29

Q:     And that involved knowing where each of the necessary forms are and being able to see the form well enough to complete it accurately. Correct?

A:     Yes.

Q:     And possible ways to accommodate that would be to organize your workstation and the paper form racks where you knew where everything was. Correct?

A:     Yes.

Q:     But if you were a floating unit secretary, you'd have to organize every single workstation. Correct?

A:     Yes.

Q:     And if you identified the form slots or racks with Braille and you were a floating unit secretary, you'd have to do that at every single unit secretary's station. Correct?

A:     Yes.

(Defendant's Exh. 1, 136:5-137:14).

To contradict this proposed fact, Plaintiff cites the report of its retained expert, which states, *inter alia*, that Ms. Banks could have carried a small hand-held, battery-operated CCTV with her to each of the stations. (Plaintiff's Exh. 11). Because the record contains conflicting evidence as to whether adaptive equipment would have to be installed at each work station to accommodate Ms. Banks, I find this fact to remain controverted.

56.    Rehabilitation Services for the Blind ("RSB") could not provide modifications for multiple work stations.

Plaintiff disputes this fact.

In support of this fact, Defendant cites Ms. Banks' deposition testimony:

Q:     (By Ms. Koch) Were you aware that Mr. Fischer told Research that he could only provide accommodations for one or two workstations, at most?

30

```
A:      I believe so.
Q:      You were aware of that?
A:      I believe so.
Q:      Do you remember how you found that out?
A:      I believe he - - I called him, and he told me about it.
```

(Defendant's Exh. 1, 183:6-15).  Defendant also cites Mr. Fischer's affidavit and

accompanying log entries.  In relevant part, Mr. Fischer's affidavit states:

> After I spoke with RMC in November 2002, I learned that Ms. Banks' on-call position required her to work at ten or more different work stations.  I informed RMC that Rehabilitation Services for the Blind would not be able to provide modifications to multiple work stations.

(Defendant's Exh. 5, ¶ 5).  The November 25, 2002, entry also stated Mr. Fischer

"informed Ms. Henderson that RSB could not provide modifications to several different

unit stations.  However, should the task analysis conclude that Zoom text software and a

CCTV would benefit Ms. Banks in performing her essential job junctions, RSB would

provide her these items to one or more unit station."  (Defendant's Exh. 5).

To dispute this fact, Plaintiff relies on the Mr. Fisher's verified statement that

reads:

> According to my narrative entry dated November 25, 2002 (Bates #001770), on November 20, 2002, Lois Henderson, Ms. Banks' supervisor, and I discussed in a telephone call Ms. Banks' position as a unit secretary or "floater" who may work at ten different work stations performing data entry and reading physician orders.  I informed Ms. Henderson that RSB could provide CCTV and Zoom Text software to one or more unit stations, but could not provide such modifications to multiple work stations.
>
> During the time that I was Jotina Banks' case worker at RSB, my supervisor indicated that the agency does not provide comprehensive modifications, such as a CCTV or similar equipment, to multiple work stations.  However, RSB potentially could have arranged for the

31

> installation of Zoom Text magnification software, which is available on a
> disk, at multiple work stations at Research Medical Center.

(Plaintiff's Exh. 3, ¶¶ 11, 12).   Plaintiff also cites the report of its retained expert, which

states, *inter alia*, that Ms. Banks could have carried a small hand-held, battery-operated

CCTV with her to each of the stations.  (Plaintiff's Exh. 11).

In light of Mr. Fischer's statement that Rehabilitation Services for the Blind could

have potentially arranged for Zoom Text magnification software to be installed at

multiple work stations, this proposed fact remains controverted.

57.   **Banks was aware that Fischer told Research that RSB could only provide**

**certain accommodations for one or two workstations, at most.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Banks' deposition:

Q:   Now, were you aware that Research was working with Mr. Fischer
in November and December of 2002 to see if - - what
accommodations might be worked out, if a job could be found for
you?

A:   I didn't know how successful that job-finding was.  That's why I
kept calling.

Q:   Okay.  Well did you know that Research was working with Mr.
Fischer in November and December of 2002 to see what
accommodations might be available, if Research could find a job
for you?

A:   I heard a little bit about it.

Q:   And were you aware that Mr. Fischer had said he could not provide
accommodations for all the stations you'd have to work at if you
were a floater unit secretary?

MS. STITH:   I'll just object.  That assumes facts not in evidence.
You can answer.

A:   I was not aware of that.

32

> Q:     (By Ms. Koch) Were you aware that Mr. Fischer told Research that
>        he could only provide accommodations for one or two
>        workstations, at most?
> A:     I believe so.
> Q:     You were aware of that?
> A:     I believe so.
> Q:     Do you remember how you found that out?
> A:     I believe he - - I called him, and he told me about it.

(Plaintiff's Exh. 1, 182:12-183:15).  The other evidence cited by Defendant does not

pertain to Ms. Banks' knowledge concerning what Mr. Fischer told Research.

Plaintiff states that although Ms. Banks responded to defense counsel's question

that Mr. Fischer told her about such a conversation with Defendant, neither "Fischer's

sworn statement submitted by Defendant with its Motion nor his attached log entry for

November 25, 2002, states that his agency could provide certain accommodations 'for

one or two workstations, at most,' but instead use[d] the phrases indicating more than one

or two, such as 'multiple work stations,' 'several different' unit stations, and 'one or more

unit station[s].'"

This proposed fact speaks to Ms. Banks' knowledge, not to whether or how many

work stations Rehabilitation Services for the Blind could accommodate.  As conceded by

Plaintiff, Ms. Banks testified at her deposition that she was aware Mr. Fischer told

Research he could only provide accommodations to limited work stations.  This fact is

uncontroverted.

58.     **Banks "felt" she could be immediately accommodated in the unit secretary
        float pool position.**

33

Plaintiff does not dispute this fact.

59. **On November 18, 2002, Henderson told Banks she would see if there were any job openings available for her.**

Plaintiff does not dispute this fact.

60. **Banks testified that at this time, she "just wanted to be working," and would have considered any position.**

Plaintiff does not dispute this fact.

61. In November 2002, Research proposed a full-time opening in housekeeping to Banks. **Banks** declined because she **found it "degrading" to go from a secretary position to a housekeeping position.**

Plaintiff does not dispute that she considered it degrading to go from a secretary position to a housekeeping position. Plaintiff does dispute, however, that Defendant proposed a full-time housekeeping position to Ms. Banks.

In support of this fact, Defendant cites Ms. Banks' deposition testimony:

Q:    Do you remember somebody at Research suggesting in November of 2002 that there was a full-time opening in housekeeping at Research?
A:    Yes.
Q:    And you declined that. Correct?
A:    That's correct.
Q:    Why?
A:    Because - - I declined because they set me up for interviews working in - - why do I want to go from a secretary to housekeeping? To me, that was degrading.

(Defendant's Exh. 1, 155:14-24).

34

Plaintiff disputes that Defendant ever proposed a full-time housekeeping position to Ms. Banks. Plaintiff notes that the above-quoted testimony states Defendant "suggested" there was a full-time opening in housekeeping, but did not "propose" such a position. It cites testimony from Ms. Henderson's deposition:

> Q:    Did you - - did you ever suggest that she apply for a custodian opening when she was first taken off the schedule?
> A:    I talked to her about maybe working in other areas of the hospital, I did not - - and I did mention housekeeping, I also mentioned laundry, also mentioned the library and I had known that human resources had accommodated people also. I asked her how she felt about some of those positions and she never answered me.
> Q:    Did you suggest those because you thought the position of housekeeping or some of the other places could be accommodated to meet her low vision?
> A:    Yes.
> Q:    And did you ever talk to human resources about accommodations for her to perform in a housekeeping or laundry position?
> A:    Yes.
> Q:    What do you remember about those discussions?
> A:    I remember discussing them, I don't know that we ever made any conclusions or what was done. That was the recruiter was helping us in this process.

(Plaintiff's Exh. 4, 115:22-116:21). Plaintiff also cited evidence that Ms. Henderson lacked authority to make offers for housekeeping positions (Plaintiff's Exh. 9, 17:22-25).

It is unclear exactly whether Defendant intends the word "proposed" to mean "offered a job" or "made aware of." However, Defendant's use of the word "declined" in the very next sentence suggests it intended "proposed" to mean "offered a job." The evidence cited by Plaintiff refutes that any such offer was made, in that Ms. Henderson lacked authority to make offers for housekeeping positions and stated she merely

35

suggested Ms. Banks apply for a full-time housekeeping position. This fact is controverted.

**62. Banks told Fischer she was not willing to consider the opening in housekeeping because she was "going blind" and questioned her ability to perform the job functions.**

Plaintiff does not dispute this fact.

**63. Research provided Banks with listings of open positions and a job opportunities website to allow her to identify other possible job options at Research.**

Plaintiff does not dispute this fact.

**64. Banks called and visited Research "lots of times" and inquired about open positions.**

Plaintiff does not dispute this fact.

**65. Research read the job listings to Banks and offered to assist Banks in filling out a transfer application for any position she desired.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Frazier's deposition:

Q: Did that cause you to take additional steps to assist her to fill out paperwork or anything like that?

A: What I did with Jotina was when I was made aware that we had some issues that we were looking at something different for her, we let her know that - - I let her know that she could talk with me at any point in time. I told her that she could call me every Monday or Tuesday morning because that's when the new job opportunities came out and I would review those with her over the phone, every single position and not just our facility, but the other

36

facilities that, you know, were affiliated with us. I would look at all those for her and that's what I told her I would do and did at that point. And also Rhonda and Pat would be more than happy to do that; also, that she could call any one of us, you know, to let us know that she was still looking and this is what - - you know, could we look for her and we absolutely did that and we would have absolutely helped her whatever needed to be done.

(Defendant's Exh. 7, 49:14-50:15)(emphasis added).

Q:     So is there anything that you did in addition with Jotina that you did differently or more often than you would have on a typical transfer?

A:     Well, yes, someone who didn't need accommodations, obviously I'm going to do more for her because she needs more assistance.

Q:     In what way did you do more for her?

A:     Well, in that somebody who doesn't have vision problems is going to look at the job opportunities bulletin themselves and then come to me. I'm not going to have to call every single person who wants a transfer. With her, I you know - - she needed to talk to me so I could give that information to her. So obviously at that point where she would have wanted to fill out a transfer application for any of those positions, then needed assistance would have been something I wouldn't have normally done for a person.

(Defendant's Exh. 7, 51:20-52:14).

Plaintiff disputes this fact, stating that Ms. Frazier never read the job listings to Ms. Banks but told Ms. Banks she could call her to review new listings. Plaintiff cites testimony, also from Ms. Frazier's deposition, in support. The cited testimony demonstrates Ms. Banks was told to contact Ms. Frazier, but does not indicate Ms. Frazier never read job listings to Ms. Banks (See Plaintiff's Exh. 10, 51:20-52:23, 62:14-18, 72:20-73:5, 74:8-75:9, 76:22-77:4, 100:25-101:5). Whether Ms. Frazier

37

communicated with Ms. Banks after January 6, 2003, is not relevant to this inquiry. I, therefore, find this fact to be uncontroverted.

66. **Banks told Human Resources that she was limited to considering only jobs near Research because she had to take the bus.**

Plaintiff does not dispute this fact. However, Plaintiff further states that Ms. Frazier testified that five of Defendant's facilities met Ms. Banks' transportation needs: Research Medical Center; Research Belton Hospital; Research Medical Center Psychiatric; Physicians Services; and Baptist Lutheran (a/k/a Baptist Medical).

67. Banks did not think it was necessary for her to take another position because she believed that Research would be able to accommodate her in her position as float pool unit secretary.

Plaintiff disputes this fact.

In support of this fact, Defendant cites Ms. Banks' deposition testimony:

> Q:   Do you recall what anyone from Human Resources at Research told you about how you could find options of other open positions at Research and what the process was to get those?
> A:   They gave me job listings, they gave me the web site, so forth.
> Q:   Who's "they"?
> A:   Human Resources.
> Q:   Do you remember who in Human Resources?
> A:   I talked to Pat Nunn about it. I talked to Lorraine Waters. And I was like, you know, "I can still do my position with the proper adapted equipment."
> Q:   Your position as a unit secretary in the float pool?
> A:   Yes. Because I was under the impression it was going to work with me while I get the equipment. So at that time, I didn't see why I should have to go to a different department to work.

38

Q:     Okay.  I understand.  I think I understand.  Are you saying that you
       didn't think it was necessary for you to go to another department
       because you thought Research was going to be able to
       accommodate you in your position as a unit secretary in the float
       pool?
A:     Yes.

(Defendant's Exh. 1, 36:2-37:4).

Plaintiff disputes this fact, stating although Ms. Banks initially thought she would

be accommodated quickly, she expressed an interest in other positions by 2003.  Plaintiff

cites the following evidence in support:

Q:     This was an e-mail from Lorraine Banks - - I'm sorry - - Lorraine
       Waters to Shawna Frazier, Mary Jo Derr about Jotina Banks.  Do
       you see that?
A:     Yes.
                              .    .    .
Q:     And it says in the first line, I received a voice mail from Jotina
       Banks on January 6, 2004, while she was RBH for the survey?
A:     Research Belton Hospital.
Q:     And this is Lorraine Waters.  Is it your understanding she was
       saying she got a voice mail while she was at Research Belton
       Hospital?
A:     That's the way I understand it, yes.
Q:     And it goes on to say that Jotina wanted to know whether she could
       come back to work or be put back on the schedule; she said she
       hasn't worked in over a year.  Do you recall reading that, whether
       you had any reaction to finding out she hadn't worked in over a
       year?
A:     I don't recall, no.
Q:     Well, let me go on.  It says she, meaning Jotina, inquired about
       receptionist duties or answering the phones.  She left her phone
       number of 444-2708 asking me to call her.  You have a vague
       recollection of getting this e-mail from Lorraine Waters?
A:     Yes.

(Plaintiff's Exh. 10, 97:1-99:3).

39

Defendant's proposed fact and the testimony cited by Plaintiff in opposition seem to relate to different time periods. Defendant's fact appears to describe Ms. Banks' mind frame initially, while Plaintiff's cited testimony reflects her thoughts at a time as late as 2004. Because Defendant's proposed fact does not contain any limitations as to time and Plaintiff's evidence demonstrates Ms. Banks ultimately believed it necessary to consider other positions, I find this fact to be controverted.

68. Banks applied for only one position at Research since her last shift as a unit secretary in October 2002.

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Banks' deposition wherein she stated she inquired about other positions but only applied for one open position in patient accounts. (Defendant's Exh. 1, 24:23-30:19).

Plaintiff disputes this fact, stating Ms. Banks also applied for a position as a Medical Office Specialist at Defendant's Physician Services facility. It cites the following testimony from Ms. Waters' deposition:

> Q: So Patricia Nunn wrote to you "I referred Jotina Banks [sic] application for a Medical Office Specialist position to Physician Services on August 1." So is that telling you that Jotina Banks had actually applied for that medical office specialist position?
> A: Application. I haven't - - I didn't see it.
>           .  .  .
> Q: You didn't see an application but Patricia Nunn used the work "application" in her e-mail to you?
> A: Yes.
>           .  .  .

40

> Q:    Okay.  And then it goes on to say, "Tamala Cleaver states that her application has been routed to the hiring manager."  Do you see that?
> A:    Yes.
> Q:    Does that refresh your recollection as to whether Jotina had actually filled out an application?
>        MS. KOCH:    Object to the form of the question as lacking foundation, calling for speculation.
> Q:    Just asking what you know.
> A:    I don't know.

(Plaintiff's Exh. 6, 128:15-129:25).

The contents of the e-mail sent to by Patricia Nunn to Ms. Waters suggest Ms. Banks applied for at least two positions at Research since October of 2002.  As a result, this fact is controverted.

69.    **In February 2004, Banks applied for and was interviewed for a full-time patient accounts position.**

Plaintiff does not dispute this fact.

70.    Banks talked to Lorraine Waters in Human Resources after the interview and told Waters that she found out that the patient accounts position was full-time and that she was only interested in working part-time, one day a week, for four to five hours a day.

Plaintiff disputes this fact.

In support of this fact, Defendant cites the following testimony from Ms. Banks' deposition:

> Q:    And after that interview, do you remember talking with Lorraine Waters?
> A:    Yes.

41

Q:      Do you remember telling Lorraine Waters that you had found out
        the position was a full-time position and that you were only
        interested in working part-time one day a week for four to five
        hours per day?

A:      Let me clarify that. I was interested in working doing something,
        either part-time or full-time, as long as I was on a schedule.
        Because I hadn't worked in so long.

Q:      Do you deny telling Lorraine Waters that you were only interested
        in working part-time one day a week for four to five hours per day?

A:      I probably didn't say that. Or I probably did say it. But I
        remember telling her that I was interested in working period.

(Defendant's Exh. 1, 195:7-24).

Ms. Banks' testimony is unclear as to whether she told Ms. Waters she was only

interested in working part time. Reading just beyond the excerpt cited by Defendant, and

also relied on by Plaintiff to dispute this proposed fact, Ms. Banks further states she

cannot recall whether she told Ms. Waters she was only interested in working part-time

one day a week for four to five hours per day. (Defendant's Exh. 1, 195:25-196:4). This

fact remains controverted.

71.    **Banks explained that part of the reason she did not apply for other positions**
**was because she believed Research could accommodate her in the unit secretary**
**float pool position as her "vision was not that bad," and she could still perform the**
**functions of her job effectively with adaptive equipment.**

Plaintiff does not dispute this fact. Plaintiff further states that while Ms. Banks

believed Defendant could accommodate her as a unit secretary, she also contacted

Defendant to work in other positions.

72.    **Banks "didn't see why [she] should have to go to a different department to**

42

**work" and she felt "that [she] should not have to fight for a job that was already [hers]."**

Plaintiff does not dispute this fact.

73.    Banks did not want to work full-time because she was concerned she would lose social security disability benefits.

Plaintiff disputes this fact.

In support of this fact, Defendant cites excerpts from Mr. Thomas' deposition testimony:

> Q:    Okay.  Did you ever discuss with Ms. Banks whether or not she told Lorraine Waters that in early 2004 she only wanted to work one day a week for four to five hours per day?
> A:    At some point she mentioned it, and it may have been in the conciliation process - -

(Defendant's Exh. 8, 150:22-151:3).

> A:    Yeah.  I don't know a lot of specifics.  I think we did had [sic] a conversation where she did inform me that she may have visited the facility.  There may have been some kind of an interview, and that she had expressed at that point that she didn't necessarily want to do a - - work in a full-time position possibly due to a benefits issue, or not getting certain benefits, or - - in the future, or endangering ones she already had.  I'm not sure.

(Defendant's Exh. 8, 153:5-15).

Plaintiff disputes this fact, citing Ms. Banks and Ms. Waters' deposition testimony in support.  Ms. Banks testified, in relevant part:

> Q:    Miss Banks, do you remember interviewing with Shelly Yost for a full-time patient accounts representative position on February 5, 2004?

43

A:      Yes.

Q:      And after that interview, do you remember talking with Lorraine
        Waters?

A:      Yes.

Q:      Do you remember telling Lorraine Waters that you had found out
        the position was a full-time position and that you were only
        interested in working part-time one day a week for four to five
        hours per day?

A:      Let me clarify that.  I was interested in working doing something,
        either part-time or full-time, as long as I was on a schedule.
        Because I hadn't worked in so long.

(Plaintiff's Exh. 1, 195:3-18).   Ms. Waters testified that February of 2004 was the first

time Ms. Banks mentioned wanting to work part time.  (Plaintiff's Exh. 6, 138:1-139:15).

        The evidence cited by Defendant does not conclusively establish that Ms. Banks

did not want to work full-time so that she could keep social security benefits.  Mr.

Thomas' testimony reflects his uncertainty as to why Ms. Banks wanted to work only part

time (i.e., he didn't know specifics, stated Ms. Banks' decision was "possibly" due to a

benefits issue, and he concluded by stating "I'm not sure.").  Moreover, the cited

testimony does not indicate whether Mr. Thomas was talking about social security

benefits as opposed to any other benefits that may accompany full-time employment.  I

find this proposed fact to be controverted.

74.     During this same time, **Fischer presented Banks with numerous employment**

**options in her occupational area, but Banks was not interested in any of these**

**positions because she already "had a job" as a float pool unit secretary on PRN**

**status.**

        Plaintiff disputes this fact.

44

In support of this proposed fact, Defendant cites testimony from Ms. Banks' deposition:

> Q: Do you remember Mr. Fischer providing you with 11 current employment options in your occupational area in November 2002, but you not appearing to be interested in those employment opportunities?
>
> A: Probably not.
>
> Q: Why weren't you interested in those employment opportunities he was bringing to your attention?
>
> A: I had a job.
>
> Q: And that job was as a unit secretary in the float pool and on an on-call PRN status? Correct?
>
> A: That's right.

(Defendant's Exh. 1, 156:6-18). Defendant also cites Mr. Fischer's affidavit:

> Throughout my work with Ms. Banks, I provided her with numerous employment options, but she was unresponsive. In February 2004, since she had not been active in any RSB service for several months, I told Ms. Banks that she should consider closing her file. That was my last contact with Ms. Banks.

(Defendant's Exh. 5, ¶ 6).

Plaintiff disputes this proposed fact, stating that the introductory phrase, "During this same time" refers to 2004. Mr. Fischer's log entries indicate he provided Ms. Banks "eleven current employment options in her occupational area" on November 20, 2002 (Plaintiff's Exh. 3, 11-25-02 log entry). Ms. Banks' testimony cited by Defendant also reflects this occurred in November of 2002. As a result, I find only the portion for this proposed fact typeset in bold to be uncontroverted.

75. **Research had difficulty contacting Banks by telephone because her telephone**

had been disconnected. Fischer also had difficulty contacting Banks by telephone because Banks had obtained an unlisted number.

Plaintiff does not dispute this fact.

76.     **In December 2002, Research asked Banks for the name of her treating optometrist/ophthalmologist as well as an authorization allowing Research to speak with him or her about Banks' visual impairment and any needed accommodations. Research advised Banks that an independent eye evaluation would assist Research in better evaluating possible accommodations.**

Plaintiff does not dispute this fact.

77.     **In late December 2002 or early January 2003, Banks provided attorneys at the Disability Law Center and the Whole Person, Inc., with an executed medical authorization so that they could obtain documents and information on Banks' behalf.**

Plaintiff does not dispute this fact.

78.     **On January 30, 2003, Banks sent Fischer a note that said, "Do not release any of my medical records to Research Medical Center, Health Midwest, without my written approval."**

Plaintiff does not dispute this fact.

79.     **Banks did not provide an executed medical authorization to Research until February 28, 2003.**

Plaintiff does not dispute this fact.

46

80. **Banks has no explanation for why she sent the note advising Fischer not to release her medical records instead of providing the medical authorization to Research.**

Plaintiff does not dispute that Ms. Banks does not know why she sent the note to Fischer before she provided the authorization to Lorraine Waters. The rest of this proposed fact is disputed.

In support of this fact, Defendant cites testimony from Ms. Banks' deposition:

Q:      So why did you send a note to Mr. Fischer not to release any of your medical records to Research Medical Center instead of sending the requested authorization to Lorraine Waters?
A:      I really don't know why I did it.

(Defendant's Exh. 1, 169:9-13).

Plaintiff also cites Ms. Banks deposition testimony to dispute this fact:

Q:      Do you remember actually sending a note to Dan Fischer that you handwrote on January 30th, 2003 saying, "Do not release any of my medical records to Research Medical Center, Health Midwest, without my written approval"?
A:      Yes.
Q:      Why did you send that to Mr. Fischer?
A:      I just wanted them to get my permission before they could get my medical records.

(Plaintiff's Exh. 1, 168:25-169:8).

The testimony cited by Plaintiff explains why Ms. Banks sent the note to Mr. Fisher; it does not, however, explain why she sent the note <u>instead of</u> providing an authorization to Defendant. This fact is uncontroverted.

81. **One of the responsibilities of being a unit secretary is to notify the**

47

**appropriate individuals when a patient needs medical attention. The unit secretaries are made aware of the patients' need for medical attention by "call lights" that appear on the unit secretary's station. Underneath the call lights are small numbers that identify the room in which the patient in need of attention is staying.**

Plaintiff does not dispute this fact.

82. **In October 2002, Banks was only able to read the room numbers under the call lights if she "got way down there at the time, if I got way up there I could make it out."**

Plaintiff does not dispute this fact.

83. **By early 2003, Banks was rendered completely unable to see the room numbers, regardless of how close she got to them.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites Ms. Banks' deposition testimony:

Q:     Let me reask the question. Could you see what room number somebody was in if you couldn't see?
A:     If I got way down there at the time, if I got way down up there I could make it out.
Q:     "At the time," you mean October 2002?
A:     Yes.
Q:     Okay. But you said after several months, several months after October 2002, you became unable to see completely. Correct?
A:     Yes.
Q:     So in early 2003, you'd be unable to see even if you got up close. Correct?
A:     Yes.

(Defendant's Exh. 1, 134:16-135:4).

In an attempt to controvert this proposed fact, Plaintiff cites the following

testimony also from Ms. Banks' deposition:

> Q:    Let me reask the question.  Could you see what room number
>       somebody was in if you couldn't see?
> A:    If I got way down there at the time, if I got way down up there I
>       could make it out.
> Q:    "At the time," you mean October 2002?
> A:    Yes.
> Q:    Okay.  But you said after several months, several months after
>       October 2002, you became unable to see completely.  Correct?
> A:    Yes.
> Q:    So in early 2003, you'd be unable to see even if you got up close.
>       Correct?
> A:    Yes.
> Q:    You also had to access the numbers for each nurse from a printed
>       list when a call light came on.  Correct?
> A:    Yes.
> Q:    Now, one of the possible accommodations Miss Mil[l]ner
>       suggested was color coding for the room indicators.  Correct?
> A:    Yes.
> Q:    Color coding wouldn't help you if you couldn't see at all, would it?
> A:    At the time, I could have benefited [sic] from it.

(Plaintiff's Exh. 1, 134:16-135:16).  Defendant also cites:

> Q:    If you put Braille room indicators, do you think that's possible?
> A:    Yes.
> Q:    Okay.  And if you were a floating unit secretary, you'd have to
>       have Braille room indicators at every single station.  Correct?
> A:    Yes.

(Plaintiff's Exh. 1, 136:2-8).

The evidence cited by Plaintiff does not contradict Defendant's proposed fact for

two reasons.  First, in the above-cited testimony, Ms. Banks states that color coding

would have helped her see the room numbers "[a]t the time," or in October of 2002.  I

49

note that just beyond this cited testimony, Ms. Banks testified color coding would not have allowed her to see the room numbers several months after October of 2002, at which point she became completely unable to see at all. (Plaintiff's Exh. 1, 135:19-136:1). Second, although Braille room indicators may have permitted Ms. Banks to ascertain the room numbers, it would not have allowed her to "see" them. I, therefore, find this fact to be uncontroverted.

84.     **Unit secretaries are also responsible for transcribing doctors' orders and the unit secretaries must be completely accurate with such orders.**

        Plaintiff does not dispute this fact.

85.     **It was "challenging" for Banks to read doctors' orders when she was working as a unit secretary at Research but she "got through it."**

        Plaintiff does not dispute this fact.

86.     **Banks knows of no adaptive equipment that would enable her to read handwritten doctors' orders.**

        Plaintiff does not dispute this fact.

87.     **Paper processing was a job duty of a unit secretary that involved knowing where each form was and being able to see the form to fill it out accurately.**

        Plaintiff does not dispute this fact.

88.     **Banks said that while enlarging the forms so that they could be filled out**

**with a larger pen might have worked in October 2002, a few months later, she**

**would not have benefitted from enlarging the forms because she became unable to**

**see even with accommodation**.

Plaintiff disputes this fact.

In support of this proposed fact, Defendant cites Ms. Banks' deposition testimony:

Q:    You could possibly enlarge the forms so they could be filled out
      with a larger pen.  Correct?
A:    Yes.  Or a magnifier.
Q:    Okay.  But that wouldn't work if your eyesight is so bad you can't
      see even with a magnifier, would it?
A:    There's devices I could have used.
Q:    Okay.  Back in October 2002.  Right?
A:    Yes.
Q:    But you said within a few months of that, you became unable to
      see a form even with the use of a magnifier.  Correct?
A:    Yes.
Q:    So enlarging the forms wouldn't help you, would it?
A:    For a short period of time I could have benefitted from it.
Q:    For a short period of time.  But after you became unable to see, it
      wouldn't help you to have an enlarged form, would it?
A:    No.

(Defendant's Exh. 1, 137:15-138:10).

Plaintiff disputes this fact, stating Ms. Banks testified she would have benefitted

from an audible program at her unit secretary work stations (Plaintiff's Exh. 1, 136:9-18).

This does not dispute whether Ms. Banks would have benefitted from enlarging the

forms.  Plaintiff also states Ms. Banks testified she would have benefitted from

magnifiers and other devices after October of 2002.  The evidence cited in support of this

assertion is the same testimony as that cited by Defendant, which establishes Ms. Banks

51

would not have benefitted from a magnifier and larger pen after October of 2002 when she became unable to see. As a result, I find this fact to be uncontroverted.

89. **Banks had trouble reading patients' names on medical charts at Research in approximately August 2002.**

Plaintiff does not dispute this fact.

90. **In October 2002, she was able to read the patient board, which is necessary for putting together patient charts and identifying which patient is in a given room, if she would "get up real close to it" or, alternatively, she "would always ask for help if – if [she] had problems looking at it."**

Plaintiff does not dispute this fact.

91. **A unit secretary is responsible for creating patient charts by inputting information recorded on the patient board into the computer.**

Plaintiff does not dispute this fact.

92. **Even with accommodation, it would be difficult or impossible for Banks to read the patient board.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites the following testimony from Ms. Banks' deposition:

> Q: Are there any other parts of the job as unit secretary in the float pool that you think would be difficult or impossible for you to do, even with some sort of adaptive equipment?
> A: Reading the board with the patients' names on the back.

52

(Defendant's Exh. 1, 42:12-17).

Plaintiff attempts to dispute this proposed fact by citing testimony from Ms.

Banks' deposition wherein she stated she thought Defendant could fully accommodate

her as a float pool secretary. (Plaintiff's Exh. 1, 38:10-39:21). However, she later went

on to testify:

> Q:    Even to the present day?
> A:    No.  My vision has deteriorated much - -
> Q:    Okay. At what point would you say you could not do your job as a
>        unit secretary on the float pool even with adaptive equipment?
> A:    That's kind of hard to say.  They didn't give me a chance.

(Plaintiff's Exh. 1, 40:21-41:2).

She further testified:

> Q:    (By Ms. Koch) Miss Banks, have you ever told anyone that you are
>        unable to do any part of the job as a unit secretary, even with
>        accommodation?
> A:    I'd say counting med drawer, that would be hard.
> Q:    Counting the medicine drawer?
> A:    Yes.
> Q:    Have you ever told anybody that?
> A:    Who did I tell that?  I believe I told Dan Fischer that.
> Q:    Are there any other parts of the job as unit secretary in the float
>        pool that you think would be difficult or impossible for you to do,
>        even with some sort of adaptive equipment?
> A:    Reading the board with the patients' names on the back.

(Plaintiff's Exh. 1, 42:2-17).

Although Plaintiff argues that Ms. Banks "testified that in the present day

(October 2005) it would be difficult or impossible for her to read the patient board even

[with] some sort of adaptive equipment because she is unable to see," I read Ms. Banks

53

testimony to mean otherwise. The initial question posed to Ms. Banks regarding whether

the aspects of float pool secretary would be difficult or impossible to perform even with

accommodations was phrased, "have you ever told anyone . . .". (See Plaintiff's Exh. 1,

42:2-3)(emphasis added). I, therefore, find this fact to be uncontroverted.

93.     **Banks would not currently be able to read the patient board.**

      Plaintiff does not dispute this fact.

94.     **Another function of the unit secretary position is sorting and counting**

**medication.**

      Plaintiff does not dispute this fact.

95.     **Counting the medication drawer involves "[w]riting down a lot of detailed**

**information, as far as how many is (sic) in the drawer, where you've gotten them**

**from. … Because you have to make sure everything's accounted for, all the meds, all**

**the needles that were used." While Banks was working as a unit secretary, "a lot of**

**times the print was so hard to see that – that that right there [was] challenging to**

**do."**

      Plaintiff does not dispute this fact.

96.     **Banks told Fischer that counting the medication drawer, even with**

**accommodation, would be difficult.**

      Plaintiff does not dispute this fact.

97.     **Banks did not believe she could sort medications safely because she was**

**concerned she would make a mistake putting medications in the bins.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Banks' deposition:

Q:    One of the tasks as a unit secretary was sorting medications. Correct?
A:    Yes.
Q:    Do you remember telling Miss Mil[l]ner that you did not feel you could perform that function safely?
A:    Yes.
Q:    And do you remember telling her you were quite concerned with safety issues, should you make a mistake when placing medications in the bins?
A:    Yes.  I told her that.

(Defendant's Exh. 1, 141:15-25).

To contradict this proposed fact, Plaintiff cites the very same evidence.  As a result, I find this fact to be uncontroverted.

98.    **Banks continued to count the medication drawer up until the last shift she worked as a unit secretary before notifying Research of her visual limitations.**

Plaintiff does not dispute this fact.

99.    **If Banks worked as a unit secretary, someone else would have to sort and count medication.**

Plaintiff does not dispute this fact.

100.    **Another unit secretary task is ordering unit supplies which entails reading small writing on medications and medical equipment.**

Plaintiff does not dispute this fact.

101.    **Banks had concerns regarding her ability to order unit supplies.  Banks**

55

believes someone else would need to perform this task for her if she worked as a unit secretary.

Plaintiff does not dispute this fact.

102. **The unit secretary is responsible for transporting samples of blood and bodily fluids.**

Plaintiff does not dispute this fact.

103. **Banks states, "[i]t would not be good" if she dropped one of these samples and she was concerned that she might do so as a result of her deteriorating vision.**

Plaintiff does not dispute this fact.

104. **Banks was concerned about patient safety, because due to her deteriorating vision she might not be able to correctly match a blood sample to the appropriate patient.**

Plaintiff does not dispute this fact.

105. **Banks felt she could not safely transport bodily fluids.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites the following excerpt from Ms. Banks' testimony:

> Q:   Do you remember telling Miss Mil[l]ner that you did not feel you could safely perform that function of pickup and delivery of blood and other lab samples?
> A:   Yes, I had concern with that.  Yes.
> Q:   Do you remember telling Miss Mil[l]ner that you were concerned of safety for the patients, as well of yourself, on carrying samples and blood to and from the labs?  Correct?

56

<pre>
A:      Yes.
Q:      And you were concerned about signing for and picking up the
        wrong narcotics or blood.  Correct?
A:      Yes.
</pre>

(Defendant's Exh. 1, 146:7-20).

Plaintiff disputes this fact, also citing this same testimony from Ms. Banks'

deposition:

<pre>
Q:      Do you remember telling Miss Mil[l]ner that you did not feel you
        could safely perform that function of pickup and delivery of blood
        and other lab samples?
A:      Yes, I had concern with that.  Yes.
</pre>

(Plaintiff's Exh. 1, 146:7-11).

I find this fact to be uncontroverted.

106.    **In December 2002, Banks again applied for Social Security disability**

**benefits.  On her application, Banks represented that she "became unable to work**

**because of [her] disabling condition on March 1, 2000."**

Plaintiff does not dispute this fact.

107.    **According to Banks, her representation on the application in December 2002**

**stating that she had been completely unable to work since March 2000, is true and**

**accurate.**

Plaintiff does not dispute this fact.

108.    **In February 2003, Banks learned that her December 2002 claim for disability**

**benefits had been denied. Banks subsequently requested a hearing before the**

**administrative law judge.**

Plaintiff does not dispute this fact.

109. **At the hearing, Banks stated that she disagreed with the determination denying her claim because, based on the medical opinions of several doctors, her disability – blindness – was not expected to improve, but rather was expected to severely degenerate over time.**

Plaintiff does not dispute this fact.

110. Around April 2003, **Banks' application for Social Security disability benefits was granted.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Banks' deposition:

Q:      Do you remember receiving a notification in April 2003 that you were entitled to monthly disability benefits?
A:      I'm not quite [sic] on the exact date, but I can remember being entitled to it.  Yes.
Q:      Okay.  And do you remember being told that the Social Security Administration found that you became disabled under their rules on October 25, 2002?
A:      Yes.
Q:      And that was a different date than you had [sic] your application.  Right?
A:      There was a date discrepancy with them.
Q:      Okay.  Because you had put March 2000 as the date you became disabled.  Correct?
A:      I believe so.
Q:      And you had said you were unable to work from March of 2000 on.  Correct?
A:      With my worsening vision.

(Defendant's Exh. 1, 188:14-189:7).

58

Plaintiff states Ms. Banks testified to receiving a fully favorable decision from the Social Security Administration, but in early 2004. In support, Plaintiff cites the following testimony:

> Q: Do you remember getting a decision from the Social Security Administration in early 2004 that you were receiving a decision that was fully favorable to you?
> A: Yes.

(Plaintiff's Exh. 1, 199:5-9).

Because there is conflicting evidence regarding when Ms. Banks' social security benefits were granted, I find only that portion of Defendant's proposed fact typeset in bold to be uncontroverted.

111. **In March 2003, after receiving Banks' medical authorization, Research hired Rita Millner of the Rehabilitation Institute of Kansas City to conduct a "task analysis" of the Research float pool unit secretary position to determine possible accommodations.**

Plaintiff does not dispute this fact.

112. **Afterwards, Millner outlined the essential functions of the position and prepared a report detailing barriers to Banks' performance of the essential functions of the job and possible accommodations.**

Plaintiff does not dispute this fact.

113. **Millner concluded in her report that she "felt that there are some significant**

59

**issues/barriers to Ms. Banks' ability to perform all aspects of the Unit Secretary,**

**Float Pool" position. "While some tasks could be readily accommodated, it is felt**

**that others will require significant accommodations and/or job-sharing/reallocation**

**of duties."**

Plaintiff does not dispute this fact.

114. Research relied on Millner's report in its consideration of possible

accommodations for Banks.

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Waters' deposition:

> Q:     And in the rest of the report Ms. Mil[l]ner sets out different types
>        of tasks and equipment barriers that Jotina would have to
>        performing in those areas given her visual impairment and possible
>        accommodations, do you see that?  She starts detailing that on
>        Bates stamped 000188 at the bottom and through 000190.
> A:     Yes.
> Q:     Do you know whether this information was ever used in trying to
>        fashion an accommodation for Jotina Banks?
> A:     Yes, it was taken into consideration.

(Defendant's Exh. 2, 154:2-13).

Plaintiff disputes this fact, also citing testimony from Ms. Waters' deposition:

> Q:     Do you know whether this information was ever used in trying to
>        fashion an accommodation for Jotina Banks?
> A:     Yes, it was taken into consideration.
> Q:     Do you know why Lois Henderson was never given a copy of it?
> A:     I can't really say that she wasn't or hadn't seen it.
> Q:     Okay, but you were here when she testified that she hadn't seen it?
> A:     Yes, I was here.
> Q:     Would you normally have expected Lois Henderson to have seen a
>        copy of it since she was Jotina's supervisor?

60

| | |
|---|---|
| A: | Yes. |
| Q: | Okay.  So why you say it was taken into consideration, do you know who took it into consideration? |
| A: | Nurse management along with the HR director, the vice president of HR. |
| Q: | And how do you know that? |
| A: | Because I report to the vice president of HR and we discussed it. |
| Q: | What do you remember about your discussion? |

.   .   .

| | |
|---|---|
| Q: | You said you reported it to your director.  Who's that? |
| A: | Frankie Hagen. |
| Q: | And what did you tell Ms. Hagen? |

.   .   .

| | |
|---|---|
| A: | We discussed the barriers and possible accommodations that were outlined and what she did with that as far as talking with Carolyn Logston or whomever, I'm not aware. |
| Q: | Did you ever speak with anyone in nursing management about the report? |
| A: | No. |
| Q: | You left that to Ms. Hagen? |
| A: | Yes. |

(Plaintiff's Exh. 6, 154:10-156:6).  Plaintiff also cites Ms. Hagen's testimony, in which she states she did not recall "ever discussing any kind of report, job analysis report, regarding Jotina Banks' job" with Lorraine Waters or anybody in nursing management, including Carolyn Logston.  (Plaintiff's Exh. 8, 77:11-79:7).  Likewise, Ms. Logston testified that she had never seen or discussed the job analysis report prepared by Ms. Millner (Plaintiff's Exh. 9, 10:17-11:15, 11:23-13:4).

Review of these excerpts reveals inconsistent evidence concerning whether individuals at Research did, in fact, review and ultimately rely on Ms. Millner's report.  As a result, this proposed fact remains controverted.

**115.  Banks told Millner that she could not safely perform the function of sorting**

61

**medication and was quite concerned she might make a mistake.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites Ms. Banks' deposition testimony:

Q:    One of the tasks as a unit secretary was sorting medications.
      Correct?
A:    Yes.
Q:    Do you remember telling Miss. Mil[l]ner that you did not feel you
      could perform that function safely?
A:    Yes.
Q:    And do you remember telling her you were quite concerned with
      safety issues, should you make a mistake when placing
      medications in the bins?
A:    Yes.  I told her that.

(Defendant's Exh. 1, 141:15-25).

Plaintiff disputes this fact, stating Ms. Banks told Ms. Millner that she "felt" she

could not perform this function safely.  I do not find this distinction to be so great so as to

contradict Defendant's proposed fact.  The fact, as proposed by Defendant, states what

Ms. Banks told Ms. Miller.  This statement is based on what functions Ms. Banks

perceived herself to be able to perform; that is, she felt she could not sort medications

safely.  The fact that Defendant does not use the word "felt" in its proposed fact does not

cause the fact to be in dispute.  I note that this fact is very similar in substance to

Defendant's proposed fact number ninety-seven, which I found to be uncontroverted.  I,

therefore, also find this fact to be uncontroverted.

116.    **Banks told Millner that she did not feel she could safely perform the function**

**of transporting laboratory samples and that she feared picking up the wrong**

**narcotics or blood.**

Plaintiff disputes this fact.

In support of this fact, Defendant cites Ms. Banks' deposition testimony:

Q: One of your tasks as a unit secretary was pick up and delivery. Correct?
A: Yes.
Q: You would have to do things like carry blood samples and other lab samples?
A: Yes.
Q: There were safety concerns should the samples be dropped and broken and that sample or specimen lost. Correct?
A: Yes.
Q: And there were safety concerns with regards to getting the correct match, for example, blood, for a patient. Correct?
A: Yes.
Q: And there were sometimes time-sensitive issues with getting the specimens to labs on time. Correct?
A: Yes.
Q: Do you remember telling Ms. Mil[l]ner that you did not feel you could safely perform that function of pickup and delivery of blood and other lab samples?
A: Yes, I had concern with that. Yes.
Q: Do you remember telling Ms. Mil[l]ner that you were concerned with safety for the patients, as well of yourself, on carrying samples and blood to and from the labs? Correct?
A: Yes.
Q: And you were concerned about signing for and picking up the wrong narcotics or blood. Correct?
A: Yes.

(Defendant's Exh. 1, 145:14-146:20).

Q: Miss Banks, before the break we were talking about your meeting with Rita Mil[l]ner, the vocational specialist. And you talked about some of the duties of a unit secretary that you just felt you could not do safely. Correct?

63

A:      Yes.

Q:      One of those was pickup and delivery of things like blood and lab
        samples?  Correct?

A:      Yes.

Q:      Were you able to do that job safely in October 2002?

A:      Yes.

(Defendant's Exh. 1, 169:21-170:7).

Plaintiff attempts to dispute this fact by stating Ms. Banks testified she "had a concern" about the pickup and delivery of blood and other lab samples and that she was concerned about the safety of herself and patients.  This is a distinction without a difference; Ms. Banks feeling she could not safely perform such function and fearing she may pick up the wrong narcotics or blood is the same as having a concern about the pickup and delivery of blood and other lab samples.  Plaintiff also cites evidence demonstrating that, while working as a unit secretary, Ms. Banks never dropped a sample of fluid she was taking to the lab (Plaintiff's Exh. 1, 127:8-16; Plaintiff's Exh. 4, 173:18-22).  This evidence does not dispute whether Ms. Banks personally felt she could safely perform the task.  As a result, I find this fact to be uncontroverted.  I note this fact is similar to Defendant's proposed fact numbers one hundred four and one hundred five, which were also found to be uncontroverted.

117.    Other than the patient accounts position for which she applied at Research in February 2004, Banks did not apply for any jobs in 2003 and 2004.

Plaintiff disputes this fact.

In support of this fact, Defendant cites testimony from Ms. Banks' deposition:

64

```
Q:    Did you actually apply for any jobs in 2003?
A:    I don't think I did.
Q:    You don't think you did?
A:    No.
Q:    Why didn't you apply for any jobs in 2004?
A:    I was still under treatment with my psychiatrist, and I was - -
      wasn't focused.
Q:    Did you feel you were unable to work in 2004?
A:    Yes.
Q:    Is that the same reason you didn't apply for any jobs in 2003?
A:    Yes.
```

(Defendant's Exh. 1, 254:20-255:11).

Plaintiff disputes this fact by citing, *inter alia*, testimony from Ms. Waters'

deposition:

```
Q:    So do you recall it as being sometime in August of 2003?
A:    Yes.
Q:    So Patricia Nunn wrote to you "I referred Jotina Banks [sic]
      application for a Medical Office Specialist position to Physician
      Services on August 1."  So is that telling you that Jotina Banks had
      actually applied for that medical office specialist position?
A:    Application.  I haven't - - I didn't see it.
                            .   .   .
Q:    You didn't see an application but Patricia Nunn used the work
      "application" in her e-mail to you?
A:    Yes.
                            .   .   .
Q:    Okay.  And then it goes on to say, "Tamala Cleaver states that her
      application has been routed to the hiring manager."  Do you see
      that?
A:    Yes.
```

(Plaintiff's Exh. 6, 128:12-129-16).

The testimony cited by Plaintiff suggest Ms. Banks applied for a medical office

specialist position in 2003.  This proposed fact is similar to Defendant' proposed fact

number sixty-eight, which was found to be controverted. I, therefore, also find this fact is controverted.

118. **The reason Banks did not apply for jobs in 2003 and 2004 is that she felt she was unable to work because she was under the care of a psychiatrist and wasn't focused.**

Plaintiff does not dispute this fact, but further states that Ms. Banks repeatedly sought positions with Defendant during that time period.

119. **Banks "believes" that, with adaptive equipment, she could work as a float pool unit secretary today.**

Plaintiff does not dispute this fact.

## IV.    *ADDITIONAL UNCONTROVERTED FACTS*

In response, Plaintiff offered an additional one hundred and twenty-one uncontroverted facts. Below, the facts typed in bold are those that I find to be undisputed based on the admissible evidence before me.

1.      **Banks has a lifelong history of myopic retinal degeneration and is legally blind with irreversible vision loss.**

Defendant does not dispute this fact, but objects as to materiality.

The substantive law determines which facts are material. Anderson, 477 U.S. at 248. "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992)(quoting

Anderson, 477 U.S. at 248). This case involves a claim for failure to accommodate under the ADA. The governing law, therefore, requires a plaintiff to show

> (1) that she has a disability within the meaning of the ADA, (2) that she is qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) that she suffered an adverse employment action because of her disability.

Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001). Once the plaintiff satisfies this initial burden, the burden of production then shifts to the defendant to prove that it "is unable to accommodate the employee." Benson v. Northwest Airlines, 62 F.3d 1108, 1112 (8th Cir. 1995).

Inadmissible evidence may not be considered in reviewing a motion for summary judgment. See Fed. R. Civ. P. 56(e). Importantly, Defendant only admits that Ms. Banks is disabled under the ADA and that she suffered an adverse employment action for purposes of the instant motion. This limited admission does not render inadmissible all facts that, if proven, would establish the first and third elements of Plaintiff's *prima facie* case. While such facts may not be material to the ultimate issue on summary judgment, they are helpful in providing background information necessary to understanding the context in which the events that precipitate this lawsuit occurred. My ultimate decision on whether Defendant is entitled to summary judgment will be limited to consideration of only those facts that I find to be material, but I will not strike Plaintiff's proposed fact on this ground.

2.     **Banks has optic atrophy, cause unknown, in her right eye, and congenital**

67

**macular dystrophy in her left eye.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

3.     **Beginning in 2000 Banks began losing some vision in her right eye and by late 2002 it had further deteriorated.**

Defendant does not dispute this fact.

4.     **By April 2002 Banks began having difficulty reading patient charts and viewing the computer screen at work.**

Defendant does not dispute this fact.

5.     **Starting in or around February 2002 and prior to July 2002, Banks began using self-provided hand-held magnifiers and a special 20/20 pen to perform her unit secretary position on 4 East.**

Defendant disputes this fact, stating that it is not supported by the record as to when Ms. Banks began using hand-held magnifiers to perform her unit secretary position on 4 East. Defendant also objects as to materiality.

In support of this fact, Plaintiff cites testimony that Ms. Banks gave notice on July 16, 2002, which stated her last working day on 4 East would be August 5, 2002 (Plaintiff's Exh. 1, 91:19-93:3). Plaintiff also cited the following testimony from Ms. Banks' deposition:

68

Q:      Excuse me.  But that's not my question, Miss Banks.  My question is why did you wait until October 2002 to tell anyone at Research that you needed special equipment to help you do your job?

A:      Because my eyes was [sic] deteriorating faster than I thought it [sic] would.

Q:      So you didn't think you needed any special equipment until October?

A:      I know I needed some.  I didn't know that I needed something that quickly.

Q:      But you didn't tell Miss Henderson at the time you applied for the transfer that you needed any special equipment, did you?

A:      Not - - nothing that would be, like, obvious as far as the huge magnifiers, because I was using the little hand-held ones.

(Plaintiff's Exh. 1, 113:21-114:11).

Q:      Well, can you explain why you were telling the federal government in July 2002 you were totally unable to work, but you're claiming in this litigation that you could work in October 2002?

A:      Yes.  Because I could work with the proper adaptive equipment, which I had told Research about it, give[n] them pamphlets.  And by not having them, I couldn't do my job successfully.

Q:      You had not told Research by July 2002 that you needed any kind of adaptive equipment.  Correct?

A:      I was using at the time, I believe it's like, the hand-held magnifiers and 20/20 pens and - -

(Plaintiff's Exh. 1, 270:15-271:2).

Q:      So can you explain for us why you told the federal government in July 2002 you were totally unable to work?

A:      In July?

Q:      Yes.

A:      My - -

Q:      Was that a false statement?

A:      No, it was not a false statement.  My vision was deteriorating, and it seems like I was having a hard time getting on the schedule and - -

Q:      In July 2002?

A:      Yes.  And I was concerned about my vision going at the rate that it went.

69

Q:      Actually, wasn't it July 2002 when you applied for a transfer from your full-time regular position as unit secretary on 4 East to the float pool?

A:      Yes.

Q:      So you're telling me you made an accurate statement to the federal government in July 2002 that you were totally unable to work. Right?

A:      I was unable to work without the proper adapted equipment.

Q:      In July 2002.

A:      Yes.

Q:      And you hadn't asked Research for any adaptive equipment in July 2002.  Right?

A:      I later asked them as my vision went further decreasing.  But I was - - I got by with my own magnifiers and that hold [sic] me over until my vision progressed even worse.

Q:      So were you or were you not able to work in July 2002?

A:      I was able to work with adapted equipment.

(Plaintiff's Exh. 1, 272:4-273:13).

Q:      So in July 2002, you were able to work by wearing glasses and using a magnifying glass?

A:      And the 20/20 pen.  Yes.

(Plaintiff's Exh. 1, 275:5-7).

Plaintiff also cites Mr. Fischer's verified statement:

In my position at RSB, I worked with consumers who have visual impairments, including Jotina Banks, whose case was assigned to me on or about February 4, 2002.

When I first met Jotina Banks shortly after being assigned her case I observed her using a low magnification hand-held magnifier similar to the type of magnifier one can purchase at a pharmacy.

(Plaintiff's Exh. 3, ¶¶ 4-5).

The evidence cited by Plaintiff establishes that Ms. Banks began using this

adaptive equipment at some point after Mr. Fischer met her in February of 2002, and

70

before July of 2002 when she applied for a transfer.  I find Plaintiff's proposed fact to be supported by the record.  With regard to Defendant's materiality objection, I decline to strike this fact for the same reasons as those more fully set forth in response to Defendant's objection to Plaintiff's proposed fact number one.

6.     **By late October 2002, Banks required certain adaptive equipment and software, such as Zoom text, a CCTV, and JAWS for Windows, to perform her unit secretary float pool position.**

Defendant disputes this fact, stating it is not supported by the record.

In support of this fact, Plaintiff cites testimony from Ms. Banks' deposition:

Q:     Do you remember Lois Henderson telling you in November 2002 that at that point you could not perform the essential functions of your job as floating unit secretary?

A:     Not in those terms, no.

Q:     In what terms?

A:     I told her I had difficulties performing my positions without the necessary accommodations, and I told her what I needed.  But without the accommodations, my vision was like - - I was just having a hard time doing my job.

Q:     Without special equipment, as of November 2002 you weren't able to perform the essential functions of your job as a unit secretary, were you?

A:     I couldn't without the accommodations.  I couldn't.

Q:     Could not?

A:     Without the accommodations.

Q:     Okay.  I thought you said couldn't. But wanted to make sure you said, "I could not without the accommodations."

A:     Right.

(Plaintiff's Exh. 1, 202:6-203:2).  Plaintiff also cites, *inter alia*, the following excerpt from Ms. Henderson's deposition:

71

Q:     And according to what she told you as you wrote in this e-mail "He is recommending several pieces of equipment including magnification goggles, special computers to magnify physician orders, among other equipment."

A:     Yes.

Q:     Do you recall her talking to you about that?

A:     Yes.

(Plaintiff's Exh. 4, 125:17-25).

Q:     Do you remember about how long he was there?

A:     Couple hours.

Q:     And did he look at - - how many stations did he look at?

A:     Two.

Q:     And where were they?

A:     I think I took him to 4-East on - - and I believe I took him to 4-North.

Q:     And your next sentence says, "he recommended a Zoom Text," I don't know what that symbol is called, but "TRA, Level 2 which will magnify the computer screens."  Is that something that was on that list that Jotina had given you?

A:     Yes.

Q:     And did you know what that was?

A:     No.

Q:     But you understood it would magnify a computer screen based on your discussions with him?

A:     Yes.

Q:     She may also need a JAWS for Windows, which is a screen reader, and is, again JAWS for Windows something that was on her list?

A:     That was on the list as I recall - -

Q:     Okay.

A:     - - that he - - that she had given me but that was his recommendations [sic].

(Plaintiff's Exh. 4, 159:7-160:10).

The evidence cited by Plaintiff establishes that Ms. Banks could not perform her

job without adaptive equipment and that Mr. Fischer recommended that she try the

72

above-listed equipment. Defendant cites no contrary evidence; therefore, I find this proposed fact uncontroverted.

7.    By February 2003 Banks was experiencing decreased vision in her right eye secondary to optic atrophy and in the left eye secondary to macular degeneration.

Defendant does not dispute this fact, but objects as to materiality, hearsay, foundation and speculation.

In support of this fact, Plaintiff cites Patricia L. Murray, O.D.'s report, which reads:

> Ocular Diagnoses:
> 1.    Optic atrophy, right eye, of unknown cause, per Dr. Roland Sabates.
> 2.    Congenital macular dystrophy, left eye, per Dr. Roland Sabates.
> 3.    Legal blindness secondary to above.
> 4.    Myopia, OU.
> Ms. Banks follows with Dr. Roland Sabates for her retinal care. She last saw him in February and I have a letter from him stating that she has decreased vision in the right eye secondary to optic atrophy and in the left eye secondary to macular degeneration. He did not specify the actual types of optic atrophy or macular degeneration present.

(Plaintiff's Exh. 2, p. 1).

The evidence cited by Plaintiff consists of Dr. Murray reciting Dr. Sabates' previous diagnoses of Ms. Banks rather than of Dr. Murray's own diagnoses. However, Dr. Murray's report is being offered for the truth of the matter stated (i.e., that Ms. Banks was experiencing decreased vision in her right eye secondary to optic atrophy and in her left eye secondary to macular degeneration). Because hearsay is given no effect in

73

considering motions for summary judgment, see Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993), this proposed fact is controverted.

8.   **By March 2003 Banks had less than 20/400 vision using any and all types of spectacle correction or magnifying devices except a CCTV, but was able to read a low vision chart using prescription glasses and a newspaper using a CCTV set to 30 times magnification, and was able to ambulate with a cane and mobility training.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

9.   **By March 2003, Dr. Murray, who evaluated Banks' vision and abilities, concluded that a CCTV would permit Banks to perform all "near tasks including reading and writing for future employment tasks."**

Defendant disputes this fact, stating it is not supported by the record. It also objects as to materiality and on the basis that Plaintiff is mischaracterizing the record. I decline to strike this fact on Defendant's materiality objection for the reasons discussed in response to Defendant's objection to Plaintiff's proposed fact number one. However, the evidence cited by Plaintiff in support of this proposed fact states that Dr. Murray wrote Ms. Banks a prescription for a "CCTV with color capabilities to distinguish her floral books and for all near tasks including reading and writing for future employment tasks." (Plaintiff's Exh. 2, at p. 3). She noted, " Ms. Banks did very well with my CCTV today.

74

. . . She did very well keeping her place and I feel will do well with this." (Plaintiff's Exh. 2, at p. 3). This fact is uncontroverted.

10. **Sometime after May 2003, Banks, who has difficulties with all aspects of life including activities of daily living, could no longer read documents even with magnification.**

Defendant does not dispute this fact.

11. **Defendant, who still considers Banks an employee, described her in March 2004 as having "vision deficits/disability."**

Defendant does not dispute this fact.

12. **On July 3, 2002, Banks applied for Social Security Disability Income ("SSDI") benefits because her vision had deteriorated, she was unable to work without her self-provided hand-held magnifiers and special 20/20 pen, and she wanted to know if she was eligible.**

Defendant admits this fact in part. It objects to this proposed fact on grounds that the testimony cited by Plaintiff inaccurately indicates that by July of 2002, Ms. Banks had told Research she needed adaptive equipment. However, Plaintiff cites page 274, lines 4 though 9, in which Ms. Banks testified that she had not asked Research for adaptive equipment in July of 2002. Furthermore, Plaintiff's proposed fact deals with when Ms. Banks applied for social security benefits, not when she requested adaptive equipment from Defendant. As a result, Defendant's objection on this basis is misplaced.

In addition, Defendant cites testimony from Ms. Banks' deposition that states:

75

| Q: | So at the time you signed an application with the federal government swearing that you were totally unable to work, you were actually able to work? |
|---|---|
| A: | I was able to work with the adapted equipment that I had until my vision worsened even worser. |
| Q: | So in July 2002, you were able to work by wearing glasses and using a magnifying glass? |
| A: | And the 20/20 pen.  Yes. |
| Q: | You didn't tell the federal government that, did you? |
| A: | I don't remember. |

(Defendant's Exh. 1, 274:23-275:10).  This testimony indicates Ms. Banks did not

remember whether she told the federal government that she was able to work with

adaptive equipment; it does not refute that her inability to do so without the equipment

was a reason motivating her decision to apply for social security benefits.  I, therefore,

find this fact to be uncontroverted.

13.     **Banks put the year 2000 as the date of onset of her eye condition on her July**

**2002 SSDI applications because a Social Security employee told her to go back so**

**many years to put down the date that her eye condition started and she recalled the**

**date of onset as occurring sometime in 2000.**

Defendant disputes this fact, stating it is not supported by the record; it also states

the testimony cited by Plaintiff is incomplete and misleading.

In support of this fact, Plaintiff cites excerpts from Ms. Banks' deposition:

| Q: | And in both of those applications you filed with the federal government claiming you were unable to work, you claimed you were unable to work from March 2000.  Right? |
|---|---|
| A: | In March 2002? |
| Q: | Right. |
| A: | That's the dates [sic] they told me to put on the application. |

76

```
Q:      Social Security.
Q:      Who at social security?
A:      I don't remember the name.
Q:      Did they tell you why to put that date?
A:      Said I had to go back so many years or so.
```

(Plaintiff's Exh. 1, 274:3-17).

```
Q:      I'm not sure why.
```

(Plaintiff's Exh. 1, 276:25).

By contrast, Defendant states that the following testimony is relevant:

```
Q:      And in that application you swore that you were unable to work
        from March 2002 forward.  Correct?
A:      That's the date they told me to put down.  Yes.
Q:      Okay.  And was that truthful?
A:      2000, I believe that was when my condition started, I believe.
Q:      What condition?
A:      I'm not quire sure, but - -
Q:      You're not quite sure what condition started in 2000?
A:      I believe it was my eye condition.  But when I was down there, she
        told me to put down a date of an onset of my condition.
Q:      And you chose the date of March 2000?
A:      Yes.
Q:      Okay.  Any why did you choose the date of March 2000?
A:      I'm not sure why.
```

(Defendant's Exh. 1, 276:6-25).

Consistent with my analysis of Defendant's proposed fact number twenty-nine,

which was found to be uncontroverted, I find that the evidence demonstrates Ms. Banks

chose the year "2000" as the date of onset, but that she was unsure why she chose to list

"March 2000."  Because this proposed fact only contemplates why Ms. Banks listed the

77

year "2000" as the date her eye condition began, I also find this fact to be uncontroverted.

14. **Sometime in August, after she was getting ready to go to the float pool position, Banks learned that her July SSDI application had been denied.**

Defendant does not dispute this fact.

15. **In October 2002, Banks requested certain adaptive equipment and software, such as Zoom text, a CCTV, and JAWS for Windows, in order to perform her unit secretary float pool position because her vision had deteriorated, and Defendant promptly removed her from the schedule and never returned her to work in any position.**

Defendant does not dispute this fact.

16. **Banks applied for SSDI benefits on December 2, 2002, because she was unable to work without accommodations.**

Defendant does not dispute this fact.

17. **Banks again put the year 2000 as the date of onset of her eye condition on December 2002 SSDI applications because in filing her previous application a Social Security employee told her to go back so many years to put down the date that her eye condition started and she recalled the date of onset as occurring sometime in 2000.**

Defendant admits this fact in part; however, it objects based on the proposed fact being incomplete and misleading. For the same reasons more fully set forth in response to Defendant's proposed fact number twenty-nine and Plaintiff's proposed fact number

78

thirteen, which were found to be uncontroverted, I also find this fact to be uncontroverted.

18.     Jotina Banks has an extensive employment background in medical secretarial and office work. **She began working for Defendant in March 2001, first as a unit secretary for Defendant in the 4 East department and, starting in August 2002, as a unit secretary in the float pool.**

Defendant admits that Ms. Banks began working for Research in March of 2001 as a unit secretary in 4 East, and began working as an on-call float pool unit secretary in August of 2002.  However, it objects on the bases that the proposed fact is argumentative and not supported by the record regarding the characterization that Ms. Banks had an extensive employment background in medical secretarial and office work.

In support of the first portion of this proposed fact, Plaintiff cites testimony concerning Ms. Banks' previous employment:

> A:     I worked at the Jackson County Courthouse for the Full Employment Council.  I worked at Bartle Hall.  I worked at Gold's Gym.  I did work study at Penn Valley Community College.  I worked at a dental office, Dr. Clark's dental office.  I did a lot of work at temp agencies.  I worked at a McDonald's, Burger King.  I worked at Truman Medical Center and Research Medical Center.

(Plaintiff's Exh. 1, 47:21-48:3).  This testimony does not support Plaintiff's statement that Ms. Banks had an "extensive employment background in medical secretarial and office work."  As a result, I find only the portion of the proposed fact typeset in bold to be uncontroverted.

19.     In or around February 2002, **Banks began providing her own hand-held**

79

**magnifiers and special 20/20 pen as accommodations for her vision difficulties in order to perform her 4 East unit secretary job, and her 4 East supervisor Kirk McCarty had spoken to Banks about her special pen and later told Banks' next supervisor, Lois Henderson, about it.**

Defendant admits this fact in part. It states that the proposed fact is not supported by the record as to when Ms. Banks began using hand-held magnifiers and a 20/20 pen. Defendant also objects to this proposed fact as being misleading and incomplete, inasmuch as it is undisputed that Ms. Banks first informed Research of her vision difficulties in October of 2002.

Of all the evidence cited by Plaintiff, the only testimony relevant to when Ms. Banks began providing her own accommodations is found in Mr. Fischer's verified statement:

> In my position at RSB, I worked with consumers who have visual impairments, including Jotina Banks, whose case was assigned to me on or about February 4, 2002.
> When I first met Jotina Banks shortly after being assigned her case I observed her using a low magnification hand-held magnifier similar to the type of magnifier one can purchase at a pharmacy.

(Plaintiff's Exh. 3, ¶¶ 4-5).

In Plaintiff's proposed fact number five above, I found it was uncontroverted that Ms. Banks began using this adaptive equipment at some point after Mr. Fischer met her in February of 2002, and before July of 2002 when she applied for a transfer. As a result,

80

I cannot now find that she did so "in or around February 2002." Only the portion of this proposed fact typeset in bold is uncontroverted.

20. **In August 2002, Banks transferred to the unit secretary float pool position because she did not feel safe working as a unit secretary in 4 East after being struck with a battery by a coworker in February 2002.**

Defendant admits this fact to the extent that it is one of the reasons Ms. Banks gave for quitting her full-time regular position to work in the float pool. Defendant objects to the proposed fact as being incomplete, misleading, and as to materiality.

In support of this fact, Plaintiff cites the following testimony from Ms. Banks' deposition:

> A:     Because after that battery incident, I had confronted my supervisor about what happened. And then I told him that I just didn't feel safe working there any longer. And I just wanted to still work at the hospital but yet just work different stations.

(Plaintiff's Exh. 1, 82:2-7).

Defendant responds that Ms. Banks also testified she quit her position in 4 East because she wanted to work different stations, to work in other departments and learn them, and because she was working nights and wanted to work in a daytime position. (Defendant's Exh. 1, 87:24-88:15, 91:19-93:17). I find this proposed fact to be uncontroverted as to one of the reasons Ms. Banks quit her full-time regular position. For the same reasons as those more fully stated in response to Defendant's materiality

81

objection to Plaintiff's proposed fact number one, I also decline to strike this fact on that basis.

21.     **It took Banks several months to transfer because she wanted a full-time position working days that offered at least three 12-hour shifts with some days off during the week.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

22.     **After Banks first approached nursing supervisor Lois Henderson in early July 2002 about working as a PRN or on-call unit secretary in the float pool, Henderson agreed that it would be a good idea to have a PRN/on-call secretary so she requisitioned management to create the position for Banks.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

23.     **Henderson already knew that Banks worked in 4 East because she had seen her, and Henderson was not surprised that Banks wanted to leave 4 East because Henderson had a lot of secretaries periodically float to 4-East who were all overwhelmed by the volume of turnover, the volume of orders, and the fast pace of the unit, and none of them liked to work there.**

82

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

24. **Henderson received Banks' transfer application from Human Resources on July 8, 2002.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

25. **On July 16, 2002, Banks gave written three weeks notice to her 4 East supervisor that her last day on 4 East would be August 5, 2002, because she knew by that time that she would be transferring to a unit secretary position in the float pool.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

26. **Defendant's written transfer policy requires at least two weeks written notice to the current supervisor before an employee may transfer, with which Banks complied.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

27. **In October 2002, several weeks after she had transferred to the unit secretary**

83

**float pool job, Banks passed her annual competency requirements for handling blood-borne pathogens, hazardous materials, infectious waste, fire safety, electrical safety, back safety, emergency preparedness, and radiation safety.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

28. In performing her unit secretary float pool job, Banks never dropped specimens or compromised specimens taking them to the lab.

Defendant disputes this fact, stating it is not supported by the record. Defendant also objects to this proposed fact as to materiality.

In support of this fact, Plaintiff cites testimony from Ms. Henderson's deposition:

Q:    Did she ever during the time you supervised her have any accidents
        where she dropped specimens or in some way compromised
        specimens taking them to the lab?
A:    No, not that I'm aware of.

(Plaintiff's Exh. 4, 173:17-22).

Defendant objects to this fact, stating Ms. Henderson only testified that "to her knowledge, Ms. Banks did not have any accidents where she dropped specimens or compromised specimens taking them to the laboratory during the time for which Henderson supervised Banks." I agree with Defendant, in that the cited testimony only establishes that Ms. Banks did not drop or compromise any specimens while under Ms.

84

Henderson's supervision - not that she "never" dropped or compromised specimens. This fact is controverted.

29. **Jotina Banks was rated by Defendant in 2002, 2003, and 2004 as meeting expectations in performing her 4 East unit secretary duties and her unit secretary-float pool duties.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

30. **At the time of her application to transfer in July 2002, Banks was hoping that her vision would no longer deteriorate so that she could continue working with her own hand-held magnifiers and 20/20 pen.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

31. **Jotina Banks came to her supervisor Lois Henderson during the week prior to Tuesday, October 22, 2002, because she felt it was necessary to get adaptive equipment, and she told Henderson that she could no longer do her job without special equipment such magnification goggles, Zoom text to magnify computer screens, and JAWS for Windows screen reader.**

Defendant does not dispute this fact.

32. **On October 26, 2002, Henderson removed Banks from the schedule.**

85

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

33. **Banks provided Defendant with detailed information concerning the types of adaptive equipment she needed to do her unit secretary [position].**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

34. **Banks' information provided to Defendant included information on the Jordy Enhanced Vision Systems, Macport and Merlin Enhanced Vision Systems, CCTV magnifiers, and other screen readers.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

35. **In addition to requesting accommodations in her unit secretary position, Banks began requesting reassignment to other clerical positions such as receptionist or answering phones during a time period when Defendant had clerical vacancies including one for a PBX Operator, which requires providing information to callers or directing the call to the appropriate party.**

Defendant admits that Ms. Banks made general requests for reassignment, but disputes the remainder of this proposed fact on the basis that it is not supported by the record.

In support of this fact, Plaintiff cites, *inter alia*, testimony from Ms. Frazier's deposition:

> Q:     You mentioned at the very beginning of the deposition there was a
>         PBX operator job considered for her.
> A:     I remember that was on the list as a vacant position.

(Plaintiff's Exh. 10, 99:4-8).

Defendant states that none of the evidence cited by Plaintiff indicates Ms. Banks had any interest in a PBX Operator position at the time she was seeking reassignment. I agree; however, Plaintiff's evidence does demonstrate that Ms. Banks made general requests for reassignment to positions with receptionist duties or answering phones (Plaintiff's Exh. 6, 131:21-23; 133:4-6). Plaintiff's proposed fact, as written, does not state that Ms. Banks was specifically interested in a position as a PBX Operator. Instead, it merely states that a vacancy was open for such a position during the relevant time period. Because the duties of a PBX Operator (i.e., providing information to callers or directing the call to the appropriate party) fall within the general category of a "clerical position," and Ms. Frazier's testimony establishes that there was a vacancy for this position, I find this fact to be uncontroverted.

36.     The adaptive equipment and training needed by Banks as a reasonable

87

accommodation would have been provided for free by Missouri Rehabilitation Services for the Blind.

Defendant disputes this fact, stating that it is not supported by the record.

In support of this fact, Plaintiff cites the testimony from Ms. Henderson's deposition:

> Q:      And what you told Lorraine in your e-mail was that Mr. Fischer said that Rehab Services for the Blind could provide equipment for probably one to two work stations and he had also said he needed to come over there at some point to see what was needed?
> A:      Yes.
> Q:      And what did you mean by using the words "that they can provide equipment"?  Did you think they could provide it at a cost to Research or at no cost?
> A:      I thought that they would provide the equipment at that point.
> Q:      Okay.
> A:      I didn't know that until that conversation with him.
> Q:      And you mean pay for it?
> A:      Yes.

(Plaintiff's Exh. 4, 143:18-144:1).

> Q:      So it was your understanding that he was going to train her on the equipment and when she understood how to use it well enough to try to get her back working at Research?
> A:      Yes.
> Q:      "He thinks that we are looking at late Jan or February before we could get her back to work."  So at that point you saw that as a month and a half to two months that Dan Fischer believed it would take to get her back?
> A:      Yes.

(Plaintiff's Exh. 4, 160:19-161:5).

> Q:      "He recommended that we give her a 30-60 day trial with the equipment to see if it actually helps to improve her job performance and build that into the plan in case she will not be

88

successful." What was your understanding of what he meant by that?

A:     My understanding was that he was actually going to work with her with the equipment first and then at that point once he had done that, then we would - - if we would set her up on a nursing unit, he would install that equipment, we would actually have her work with it 30 to 60 days to see if it was going to work or accommodate her.

(Plaintiff's Exh. 4, 162:1-14). Plaintiff also cites testimony from Ms. Waters' deposition:

Q:     Did you at some point later in time let Frankie know that [R]ehabilitation [S]ervices for the [B]lind had offered to provide the equipment that they thought Jotina needed to do her position?

A:     Yes.

(Plaintiff's Exh. 6, 73:22-74:2). Finally, Plaintiff cites the following testimony from Ms.

Frazier's deposition:

Q:     All right. And do you remember ever hearing that the Missouri Rehab Services for the Blind or some state agency would provide the equipment needed?

A:     I did hear that, but I wasn't - -

Q:     At no cost to you?

A:     I did hear that, but was not involved in those discussions. I had just heard that along the time we were looking at the accommodations, so - -

(Plaintiff's Exh. 10, 60:2-11).

        To dispute this fact, Defendant cites Mr. Fischer's Verified Statement, in which

he states he "informed Ms. Henderson that RSB could provide a CCTV and Zoom Text

software to one or more unit stations, but could not provide such modifications to

multiple work stations." (Plaintiff's Exh. 3, ¶ 11). Defendant also cites Mr. Fischer's

statement in support of its argument that Plaintiff is misleading the court by implying that

89

Mr. Fischer was certain that such adaptive equipment and training would have enabled

Ms. Banks to perform all of the essential functions of the unit secretary position:

> Ms. Henderson and I concluded that several accommodations to be provided by RSB would be considered, including Zoom Text software installation to magnify computer screens, a CCTV for viewing documents, and cane-training for Ms. Banks.

(Plaintiff's Exh. 3, ¶ 13).

The evidence cited by Defendant controverts Plaintiff's proposed fact in two

different ways.  First, it is disputed whether Missouri Rehabilitation Services for the

Blind could have provided the adaptive equipment needed by Ms. Banks, as Mr. Fisher

stated the agency could not provide such modifications to multiple work stations.

Second, the evidence cited by Plaintiff does not indicate such equipment would have been

a "reasonable accommodation," as Mr. Fischer did not yet know whether it would be

successful.  I, therefore, find this fact to be controverted.

37.     **In October and November 2002, Banks again told Henderson that she had difficulty performing her position without the necessary accommodations and told Henderson about some of the adaptive equipment she needed.**

Defendant does not dispute this fact.

38.     **Banks signed authorizations on October 18, 2002, and November 18, 2002, permitting her case worker Dan Fischer of Missouri Rehabilitation Services for the Blind and Defendant to discuss Banks' disability, services needed to be successful in her current job, and medical and vocational issues relating to job retention.**

90

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

39.     **On November 12, 2002, Banks met with Steve Davidson in Human Resources to discuss what type of adaptive equipment she needed and went over a list of adaptive equipment that she had provided to him including Pl. Ex. 7, Davidson demo 74:23-75:16, 76:18-77:2, 78:20-79:23, 80:25-81:14, 82:20-83:1, 83:10-15 and attached Deposition Exhibit 34.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

40.     **On December 11, 2002, Banks' caseworker Fischer met with Henderson and conducted a two-hour job task analysis of Banks' unit secretary position.**

Defendant does not dispute this fact.

41.     Fischer told Henderson that Banks could perform all the unit secretary functions, including taking specimens to the lab, answering call lights and phones, and using pagers, with the accommodations of cane training and equipment provided by Rehabilitation Services for the Blind, including Zoom text software to magnify computer screens, JAWS for Windows screen reader, and a CCTV for reading documents.

91

Defendant disputes this fact, arguing that it is not supported by the record.

Defendant also objects to this proposed fact as mischaracterizing the testimony and being misleading.

In support of this fact, Plaintiff cites excerpts from Ms. Henderson's deposition:

Q:     And it says, "He came up and did a work site survey and thinks he
       could get the necessary equipment for Jotina to function as a unit
       secretary."  Do you remember about how long he was there?
A:     Couple hours.
(Plaintiff's Exh. 4, 159:4-10).
Q:     And your next sentence says, "he recommended a Zoom Text," I
       don't know what that symbol is called but "TRA, Level 2 which
       will magnify the computer screens."  Is that something that was on
       that list that Jotina had given you?
A:     Yes.
Q:     And did you know what that was?
A:     No.
Q:     But you understood it would magnify computer screens based on
       your discussions with him?
A:     Yes.
Q:     She may also need a JAWS for Windows, which is a screen reader,
       and is, again, JAWS for Windows something that was on her list?
A:     That was on the list as I recall - -
Q:     Okay.
A:     - - that he - - that she had given me but that was his
       recommendations.
Q:     Okay.
A:     These were both his recommendations.
Q:     After he looked at the work stations?
A:     Yes.

(Plaintiff's Exh. 4, 159:17-160:14).

Q:     "I was concerned with the other things that go along with the job
       i.e. taking spec. to lab, answering call lights, phones, use of pagers,
       etc."  And you were - - those were the concerns - - among the
       concerns you expressed to Mr. Fischer?
A:     Yes.

92

> Q: And "He" meaning Mr. Fischer, "said he thinks that with this equipment and cain [sic] training that she should still be able to do all of these job functions"; is that right?
>
> A: Yes.
>
> Q: So he believed that she could do the unit secretary job at least at a couple of stations with the equipment that you've listed in here and cane training?
>
> A: Yes.
>
> Q: And did you understand that to mean walking with a cane?
>
> A: Yes.

(Plaintiff's Exh. 4, 161:6-25). Plaintiff also cites Mr. Fischer's verified statement:

> According to my narrative entry dated December 12, 2002 (Bates #001772-73), on December 11, 2002, I met with Ms. Banks's [sic] supervisor, Lois Henderson, to complete a job task analysis. Ms. Henderson and I concluded that several accommodations to be provided by RSB would be considered, including Zoom Text software installation to magnify computer screens, a CCTV for viewing documents, and cane-training for Ms. Banks. We discussed that Ms. Banks' working in one station with a fixed schedule would be the best option and that Ms. Henderson was exploring other positions besides unit secretary. Ms. Henderson stated that Research Medical Center would contact me and Ms. Banks when an opening for Ms. Banks was identified.

(Plaintiff's Exh. 3, ¶ 13).

To dispute this testimony, Defendant cites the following testimony from Ms.

Henderson's deposition:

> Q: An in here you recap what occurred during his visit and what you and he discussed for Lorraine?
>
> A: Yes.
>
> Q: And it says, "He came up and did a work site survey and <u>thinks</u> he could get the necessary equipment for Jotina to function as a unit secretary."
>
> . . .
>
> Q: "His intent is to work with JoTina on the equipment first <u>to see if this equipment will actually help her vision</u> and then will order and get installation done." So was it your understanding that he was

93

> going to train her on the equipment and when she understood how
> to use it well enough <u>to try</u> to get her back working at Research?
>
> A:     Yes.
>
>                     .     .     .
>
> Q:     And "He" meaning Mr. Fischer, "said he <u>thinks</u> that with this
>        equipment and cain [sic] training that <u>she should</u> still be able to do
>        all of these job functions"; is that right?
>
> A:     Yes.
>
> Q:     So he believed that she could do the unit secretary job at least at <u>a</u>
>        <u>couple of stations</u> with the equipment that you've listed in here and
>        cane training?
>
> A:     Yes.

(Plaintiff's Exh. 4, 158:25-161:25)(emphasis added by Defendant).

Plaintiff's proposed fact suggests that Ms. Banks would be able to perform the

duties of a unit secretary. However, the evidence cited by Plaintiff indicates that Mr.

Fischer wanted to first try the equipment to see if it would allow Ms. Banks to perform as

needed. Due to this inconsistency, this fact is controverted.

42.    **Fischer told Henderson that he would train Banks on using the equipment,**

**that she would be ready to work by late January or early February 2003, and that**

**he recommended a 30 to 60 day trial in her position using the equipment.**

Defendant does not dispute this fact.

43.    Fischer told Henderson that he could provide Zoom text software and a CCTV to

one or more work stations.

Defendant does not dispute this fact, but objects that it is misleading and

incomplete.

In support of this fact, Plaintiff cites Mr. Fischer's verified statement:

94

> According to my narrative entry dated November 25, 2002 (Bates #001770), on November 20, 2002, Lois Henderson, Ms. Banks' supervisor, and I discussed in a telephone call Ms. Banks' position as a unit secretary or "floater" who may work at ten different work stations performing data entry and reading physician orders. I informed Ms. Henderson that RSB could provide a CCTV and Zoom Text software to one or more unit stations, but could not provide such modifications to multiple work stations.

(Plaintiff's Exh. 3, ¶ 11).

I find this fact to be controverted. While the evidence demonstrates, and Defendant admits, that Mr. Fischer told Ms. Henderson that Rehabilitation Services for the Blind could provide adaptive equipment to "one or more unit stations," the meaning of this statement is unclear. Mr. Fischer stated Rehabilitation Services for the Blind could provide the equipment for "one or more unit stations," but not "multiple work stations." I equate "multiple" with meaning "more than one" and, therefore, cannot reconcile the internal inconsistencies within Mr. Fischer's statement.

**44.** **Fischer could have arranged for Zoom text magnification software, which is available on a disk, to be installed at multiple work stations at the Research Medical Center facility, and Banks could have carried a hand-held, battery-operated CCTV with her to each work station to magnify documents.**

Defendant does not dispute this fact, but objects as to materiality and on the bases that this proposed fact is misleading and incomplete.

In support of this fact, Plaintiff cites portions of Mr. Fischer's verified statement:

> According to my narrative entry dated November 25, 2002 (Bates #001770), on November 20, 2002, Lois Henderson, Ms. Banks'

95

supervisor, and I discussed in a telephone call Ms. Banks' position as a unit secretary or "floater" who may work at ten different work stations performing data entry and reading physician orders. I informed Ms. Henderson that RSB could provide a CCTV and Zoom Text software to one or more unit stations, but could not provide such modifications to multiple work stations.

   During the time that I was Jotina Banks' case worker at RSB, my supervisor indicated that the agency does not provide comprehensive modifications, such as a CCTV or similar equipment, to multiple work stations. However, RSB potentially could have arranged for the installation of Zoom Text magnification software, which is available on a disk, at multiple work stations at Research Medical Center.

(Plaintiff's Exh. 3, ¶¶ 11, 12). Plaintiff also cites from its expert's report, which states that Ms. Banks could have carried a hand-held, battery operated CCTV to each of the work stations. (Plaintiff's Exh. 11, at p. 15).

I decline to strike this fact on Defendant's materiality objection for the same reasons as those more fully stated my response to Plaintiff's proposed fact number one. I also decline to strike this proposed fact based on Defendant's objections that it is misleading and incomplete. The evidence cited by Plaintiff demonstrates that Rehabilitation Services for the Blind could have potentially arranged for Zoom Text software to be installed at multiple work stations. Defendant states that "[while Fischer now states that he could have arranged for Zoom test software to be installed at multiple work stations, it is undisputed that he told Lois Henderson that he could not." Defendant does not cite any evidence in support of this assertion, and a review of the proposed facts that I have found to be uncontroverted does not reveal such a fact.

96

A dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. Anderson, 477 U.S. at 249. Merely denying a proposed fact without pointing to any evidence in the record does not result in a proposed fact being considered disputed for summary judgment. As a result, I will not strike Plaintiff's proposed fact on this basis.

Defendant also states, "[w]hile the EEOC's expert now states that a hand-held, battery operated CCTV could have assisted Banks at each work station, such accommodation was not requested or even suggested by Banks or Fischer." Defendant does not point to any evidence in the record to support this statement. As a result, I find Plaintiff's proposed fact to be neither misleading nor incomplete.

45. **On February 28, 2003, Banks provided Defendant with the signed medical authorization to communicate with Banks' ophthalmologist or optometrist and review her medical records.**

Defendant does not dispute this fact.

46. **In March and May 2003, Banks met with Rita Millner of The Rehabilitation Institute, the entity Defendant had retained in March 2003 to prepare a second job task analysis of Banks' unit secretary position.**

Defendant does not dispute this fact.

47. **Banks told Millner that she had been evaluated for low vision, was learning Braille, and was participating in mobility training.**

97

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

48.     **Beginning in November 2002 and continuing into the fall of 2004, Banks contacted Defendant, including her supervisor Lois Henderson and Human Resources [employee] Lorraine Waters, many times about returning to work as a unit secretary, answering phones, being a receptionist, or doing some other work.**

Defendant does not dispute this fact.

49.     **Five of Defendant['s] facilities met Banks' bus transportation needs, including Research Medical Center, Research Belton Hospital, Research Medical Center Psychiatric, Physicians Services, and Baptist Lutheran (a/k/a Baptist Medical).**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

50.     **In August 2003, Banks applied for Medical Office Specialist at Defendant's Physician Services facility although Lorraine Waters does not recall the application or hearing any follow-up information about it.**

Defendant does not dispute this fact.

51.     **In January 2004, Banks contacted Waters inquiring about a job performing receptionist duties or answering phones.**

Defendant does not dispute this fact.

52. By February 2004 Banks told Waters that she would work full-time or part-time because she hadn't worked in so long as long as she got on the schedule.

Defendant disputes this fact, stating that it is not supported by the record.

In support of this fact, Plaintiff cites testimony from Ms. Banks' deposition:

Q: Miss Banks, do you remember interviewing with Shelly Yost for a full-time patient accounts representative position on February 5th, 2004?
A: Yes.
Q: And after that interview, do you remember talking with Lorraine Waters?
A: Yes.
Q: Do you remember telling Lorraine Waters that you had found out the position was a full-time position and that you were only interested in working part-time one day a week for four to five hours per day?
A: Let me clarify that. I was interested in working doing something, either part-time or full-time, as long as I was on a schedule. Because I hadn't worked in so long.

(Plaintiff's Exh. 1, 195:3-18).

To dispute this fact, Defendant also cites testimony from Ms. Banks' deposition:

Q: Do you deny telling Lorraine Waters that you were only interested in working part-time one day a week for four to five hours per day?
A: I probably didn't say that. Or I probably did say it. But I remember telling her that I was interested in working, period.

(Plaintiff's Exh. 1, 195:19-24).

The testimony cited by Defendant indicates Ms. Banks testified both that she "probably didn't say" that she was only interested in working part-time and also that she "probably did say it." As a result, I find this proposed fact to remain controverted.

99

53.     **On February 5, 2004, Banks applied and was interviewed for the position of Patient Accounts Representative.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

54.     **By October 2004, two years after Defendant removed her from the schedule, Banks was still contacting Defendant trying to get on the schedule or get a position as a receptionist.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

55.     **Throughout 2003 and 2004, Banks took the refresher/training classes required by Defendant to stay on its eligible employee list.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

56.     **In mid-October 2002, Banks gave Henderson a list of special equipment needed to perform her job but Henderson never discussed it with her at all.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

100

57.     **Henderson took Banks off the schedule on October 26, 2002 when Banks could no longer read the computer screen even with her magnifying mirrors.**

Defendant does not dispute this fact.

58.     **By October 31, 2002, Henderson concluded that Banks could not be accommodated in the unit secretary float pool position even though she had not conducted a job analysis of the position for a low vision employee requesting accommodations.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

59.     **On October 31, 2002, Henderson informed Lorraine Waters that she did not believe that Banks could be accommodated in the unit secretary float pool position.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

60.     **After several attempts, case worker Dan Fischer finally reached Lois Henderson by telephone on November 20, 2002, to discuss the job duties of a unit secretary float pool and possible accommodations such as Zoom text and a CCTV.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

101

61.    On November 21, 2002, Henderson learned from Fischer that his agency,

Missouri Rehabilitation Services for the Blind, could provide the equipment needed by

Banks for free.

Defendant admits that Ms. Henderson was told by Mr. Fischer, prior to

conducting his on-site analysis, that RSB could probably provide equipment for one to

two work stations at no cost to Research.  Defendant objects to the balance of this

proposed fact as being misleading, unsupported by the record, and as mischaracterizing

the testimony.  Defendant argues that this proposed fact implies that all of the equipment

"needed by Banks" could be provided by RSB, which is not supported by the record.

In support of this fact, Plaintiff cites testimony from Ms. Henderson's deposition:

Q:    And by November 21st, two days after you had Steve Davidson's
       e-mail, you had actually talked to Dan Fischer?
A:    Right.
Q:    And you had a pretty lengthy discussion with him on the phone, I
       assume?
A:    Yes.
Q:    And I'm going to not go through every line of this if I can avoid it.
       You talked - - you were reporting to Lorraine here your discussion
       with Dan Fischer on or about November 21st?
A:    Yes.
Q:    And what you told Lorraine in your e-mail was that Mr. Fischer
       said that Rehab Services for the Blind could provide equipment for
       probably one to two work stations and he had also said he needed
       to come over there at some point to see what was needed?
A:    Yes.
Q:    And what did you mean by using the words "that they can provide
       equipment"?  Did you think they could provide it at a cost to
       Research or at no cost?
A:    I thought that they would provide the equipment at that point.
Q:    Okay.
A:    I didn't know that until that conversation with him.

102

Q:    And you mean pay for it?
A:    Yes.

(Plaintiff's Exh. 4, 143:5-144:10).

As reflected above in Defendant's proposed facts number fifty-six and Plaintiff's proposed facts numbers thirty-six and forty-three, the number of work stations to which Rehabilitation Services for the Blind could provide adaptive equipment is in dispute. Because the phrase, "equipment needed by Banks," contained in the instant proposed fact is open to differing interpretations as to whether it means "all" the equipment needed by Ms. Banks, I find this fact to be controverted.  See Ozark Interiors, Inc. v. Local 978 Carpenters, 957 F.2d 566, 569 (8th Cir. 1992)("Summary judgment is inappropriate when the record permits reasonable minds to draw conflicting inferences about a material fact.").

62.    **On November 21, 2002, Henderson again told Waters that Banks could not be accommodated in the unit secretary float pool position.**

Defendant does not dispute this fact, but objects as to materiality.  For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

63.    **On November 25, 2002, Henderson told Banks that the unit secretary float pool position would not work and that Henderson hoped to find a unit-based position for Banks within a couple of weeks.**

Defendant does not dispute this fact.

103

64.     Henderson delayed contacting Fischer to set up an onsite job analysis until after Steve Davidson in Human Resources talked to Henderson in the hallway and then complained about the delay to Waters in a December 5, 2002, email.  Fischer conducted the onsite job analysis on December 11, 2002.

Defendant disputes this fact, stating it is not supported by the record.  Defendant also objects as to materiality.

In support of this fact, Plaintiff cites testimony contained in Mr. Fischer's verified statement:

> According to my narrative entry dated November 25, 2002 (Bates #001770), on November 20, 2002, Lois Henderson, Ms. Banks' supervisor, and I discussed in a telephone call Ms. Banks' position as a unit secretary or "floater" who may work at ten different work stations performing data entry and reading physician orders.  I informed Ms. Henderson that RSB could provide a CCTV and Zoom Text software to one or more unit stations, but could not provide such modifications to multiple work stations.

> According to my narrative entry dated December 12, 2002 (Bates #001772-73), on December 11, 2002, I met with Ms. Banks' supervisor, Lois Henderson, to complete a job task analysis.  Ms. Henderson and I concluded that several accommodations to be provided by RSB would be considered, including Zoom Text software installation to magnify computer screens, a CCTV for viewing documents, and cane-training for Ms. Banks.  We discussed that Ms. Banks' working in one station with a fixed schedule would be the best option and that Ms. Henderson was exploring other positions besides unit secretary.  Ms. Henderson stated that Research Medical Center would contact me and Ms. Banks when an opening for Ms. Banks was identified.

104

(Plaintiff's Exh. 3, ¶¶ 11, 13). Plaintiff further cites Mr. Fischer's December 12, 2002,

log entry, which details his visit to Research Medical Center.

Plaintiff also cites testimony from Mr. Davidson's deposition:

> Q: Okay. And do you recall asking anybody else to contact anybody else at Research Medical Center or RMC to contact Mr. Fischer about Jotina Banks?
> A: Lois Henderson was supposed to have a meeting with him at some point in time and, again, that's basically all I remember.
> Q: Do you remember telling Lois Henderson to contact him?
> A: Either she contact him or him contact her, I'm not sure which - - which way it went.
> Q: But you have some recollection that they were supposed to make contact?
> A: Yes.

(Plaintiff's Exh. 7, 91:11-24).

> Q: Okay. Let me show you what I've marked as - - previously marked as Plaintiff's Exhibit 41 and it's a printout of an e-mail and just take a minute to read it.
> A: (Witness complies.) Okay.
> Q: Does this - - first of all, is this a printout of an e-mail that you reviewed prior to your deposition?
> A: I believe so, yes.
> Q: And do you have a recollection of sending an e-mail around December 5th, 2002, to Lorraine Waters about Jotina Banks?
> A: Yes.
> Q: So this appears to be a printout of an e-mail that you sent to Lorraine Waters?
> A: Yes.

(Plaintiff's Exh. 7, 98:7-23).

> Q: typed in - - you skipped a space sort of starting a new paragraph and you typed, "Wasn't this suppose[d] to have been done several weeks ago," do you see that?
> A: Yes, ma'am.
> Q: What did you think should have been done several weeks ago?

105

| A: | And agin, I think this is in reference to this e-mail that's dated Tuesday, November the 19th, 2002. |
|---|---|
| Q: | Okay. Just back up. |
| A: | Exhibit 37. |
| Q: | You're referring to - - and that was the e-mail where you actually sent an e-mail to Lois Henderson saying, "Did you call Dan Fischer? He called and left me a voice message re: Jotina"? |
| A: | Correct. |
| Q: | So your recollection is you wrote wasn't this supposed to have been done several weeks ago as to Lois contacting Dan Fischer? |
| A: | Correct. |
| Q: | Do you remember having any concerns that he hadn't been contacted earlier at the time you wrote this December 5th, 2002 e-mail? |
| A: | I may have. I don't recall. |
| Q: | Okay. Do you remember what prompted you to write that? |
| A: | Well, it would have been - - I probably - - I would have to say that it would have been concern enough for me to have prompted the e-mail and send it to Lorraine since this was kind of follow-up that it was supposed to have been done back around November 19th, 20th, you know, Thanksgiving, you know, break in there kind of a deal so, yeah, I would say there would have been some concern. |

(Plaintiff's Exh. 7, 105:1-106:9). Exhibit 41, as referred to in Mr. Davidson's testimony,

reads:

> Lois Henderson just stopped me in the hallway (12/5/02 @ 10:30 a.m.) re: Jotina Banks. Lois stated Jotina called, yesterday I believe is what she said, and that Jotina wanted to be put on the schedule. Lois asked me "We don't have a place for her do we". I stated to Lois, "it was my understanding that Jotina would not be able to work on the units until Daniel Fischer had come out to look at the computers on the unit and to find out how many computers we would be able to get "outfitted" to accommodate [sic] Jotina's vision deficiency." I then asked Lois if Mr. Fischer had been contacted to come out to look at the unit(s) in question and she stated she would call him to make an appointment to have him come out. I told Lois is [sic] was my understanding that we could not accommodate [sic] Jotina's return to work without having the computers "outfitted" to meet her needs. This was nursing operations concern too if I remember correctly.

106

Wasn't this suppose [sic] to have been done several weeks ago?

The evidence cited by Plaintiff establishes that Mr. Fischer conducted the onsite job analysis on December 11, 2002. It does not, however, establish that Ms. Henderson "delayed" contacting Mr. Fischer or that she ultimately contacted him after being confronted by Mr. Davidson. This fact is controverted. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

65. **When Henderson spoke to Davidson in the hallway in early December about Banks, she said to him, "We don't have a place for her do we[?]".**

Defendant does not dispute this fact, but objects as to materiality.

66. Dan Fischer told Henderson during the December 11, 2002, visit that Banks could be accommodated in the unit secretary position with training and equipment provided by Rehabilitation Services for the Blind, and Fischer recommended a 30- to 60-day trial period, but Banks was never given an opportunity to work again as a unit secretary.

Defendant disputes this fact, stating it is not supported by the record. Defendant also objects to this proposed fact on the bases that it is misleading, incomplete and mischaracterizes the record testimony.

In support of this fact, Plaintiff cites testimony frm Ms. Henderson's deposition:

Q:      And "He" meaning Mr. Fischer, "said he thinks that with this
        equipment and cain [sic] training that she should still be able to do
        all of these job functions"; is that right?
A:      Yes.

Q:      So he believed that she could do the unit secretary job at least a couple of stations with the equipment that you've listed in here and cane training?

A:      Yes.

Q:      And did you understand that to mean walking with a cane?

A:      Yes.

Q:      "He recommended that we give her a 30-60 day trial with the equipment to see if it actually helps to improve her job performance and build that into the plan in case she will not be successful." What was your understanding of what he meant by that?

A:      My understanding was that he was actually going to work with her with the equipment first and then at that point once he had done that, then we would - - - if we would set her up on a nursing unit, he would install that equipment, we would actually have her work with it 30 to 60 days to see if it was going to work to accommodate her.

Q:      Do you know if that was ever done for Jotina?

A:      It was not.

(Plaintiff's Exh. 4, 161:13-162:17). Plaintiff also cited testimony from Ms. Waters'

deposition:

Q:      Do you recall any effort by Research to start a 30-day to 60-day trial period for Jotina in a unit secretary position with that equipment and after she had cane training?

A:      Okay. Could you reask - - could you ask that question again, please, reask it?
        MS. STITH:    Can you repeat the question, Lea Ann?
        (The last question was read by the reporter.)

A:      In looking at Lois' e-mail she had indicated in this e-mail that we were looking at about last January or February before she could come back to work. We were just in the middle of December.

Q:      (By Ms. Stith) At any time after this e-mail was written do you know whether Research ever put Jotina back to work in a unit secretary position for any period of time?

A:      No.

Q:      Research did not?

A:      No.

108

(Plaintiff's Exh. 6, 87:3-24).

Defendant states that Plaintiff's proposed fact is not supported by the record. I agree. Mr. Fischer did not state that Ms. Banks could be accommodated in the unit secretary position, but rather that he believed that she could perform necessary job functions with the adaptive equipment, at least at a couple of stations, but would not know for sure until after a trial period. This fact is controverted.

67. On December 11, 2002, Fischer believed that he and Henderson had concluded that Banks could be accommodated with Zoom text software installation to magnify computer screens, a CCTV for viewing documents, and cane-training.

Defendant disputes this fact, stating that it is not supported by the record. Defendant also objects to this proposed fact on grounds that it is misleading and mischaracterizes the record.

In support of this fact, Plaintiff cites Mr. Fischer's verified statement:

According to my narrative entry dated December 12, 2002 (Bates #001772-73), on December 11, 2002, I met with Ms. Banks' supervisor, Lois Henderson, to complete a job task analysis. Ms. Henderson and I concluded that several accommodations to be provided by RSB would be considered, including Zoom Text software installation to magnify computer screens, a CCTV for viewing documents, and cane-training for Ms. Banks. We discussed that Ms. Banks' working in one station with a fixed schedule would be the best option and that Ms. Henderson was exploring other positions besides unit secretary. Ms. Henderson stated that Research Medical Center would contact me and Ms. Banks when an opening for Ms. Banks was identified.

(Plaintiff's Exh. 3, ¶ 13).

This testimony does not support Plaintiff's proposed fact. Paragraph thirteen of Mr. Fischer's verified statement states that he and Ms. Henderson "concluded that several accommodations . . . would be considered"; they did not conclude considerations would work to accommodate Ms. Banks. This fact is controverted.

68. After his visit, Henderson did not agree with Fischer that Banks could not be accommodated as a unit secretary in the float pool or in a unit-based position.

Defendant disputes this fact, stating that it is not supported by the record. Defendant also objects to this proposed fact as to materiality and on grounds that it is misleading and mischaracterizes the record.

In support of this fact, Plaintiff cites Ms. Henderson's deposition testimony:

Q:     In the rest of the e-mail you mention that Mr. Fischer's going to talk to Jotina about his meeting with you and then you wrote "I just need for us to find her an actual unit based position."
A:     Yes.
Q:     So at that point did you feel like she could be accommodated, it was just a question of finding the position?
A:     At that point I felt that Mr. Fischer thought she could be accommodated but we did not have an [sic] position for her to go to. I don't know that I could say that I felt one way or the other, if we could accommodate her, because I still had reservations about patient safety issues.
Q:     But at least he believed they could be addressed?
A:     Right. I'm not sure I agreed with him, but . . .

(Plaintiff's Exh. 4, 162:18-163:10).

This evidence does not support Plaintiff's proposed fact. The cited testimony indicates Ms. Henderson was unsure whether Ms. Banks could be accommodated and

110

was not sure she agreed with Mr. Fischer that patient safety issues could be addressed. Due to this uncertainty, I find this fact to be controverted.

69.     **After Fischer's work site analysis on December 11, 2002, Henderson told him that Defendant would contact him and Banks after an opening for Banks was identified, but Defendant never contacted Fischer again so he concluded that Defendant was not interested in proceeding with his recommendations for work station modifications.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

70.     **Defendant never made any effort to start a 30-day to 60-day trial period for Banks in a unit secretary position with the equipment and training recommended by Fischer.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

71.     **According to Waters, at some point after Fischer completed his job analysis in December 2002, nurse management, including Carolyn Logston, Director of Nursing, expressed safety concerns about returning Banks to a unit secretary position even with the equipment and training accommodations recommended by Fischer.**

111

Defendant does not dispute this fact.

72. **Carolyn Logston, who was Henderson's supervisor, does not recall any conversations or concerns about safety, but instead recalls a concern about Banks' proficiency in reading and carrying out physicians' orders.**

Defendant does not dispute this fact.

73. **On December 24, 2002,** just two weeks after Fischer informed Defendant that Banks could be accommodated as a unit secretary, **Defendant sent Banks a written request requiring her to have an independent eye evaluation and to provide authorization for Defendant to contact her treating ophthalmologist/optometrist to "better determine what requirements are needed to accommodate your disability."**

Defendant admits that Research requested Ms. Banks undergo an independent eye evaluation and provide a medical authorization. Defendant objects to the remainder of this proposed fact as being argumentative and mischaracterizing the record. Defendant states that the record does not reflect that "Fischer informed Defendant that Banks could be accommodated as a unit secretary."

Consistent with my reasoning in response to Plaintiff's proposed fact numbers sixty-six and sixty-seven, the evidence is disputed as to whether Mr. Fischer told Defendant that Ms. Banks could be accommodated or whether he said certain equipment would be used to determine if Ms. Banks could be accommodated. I, therefore, find this fact to be controverted.

74. **According to Waters, Defendant sent the December 24, 2002, letter because it**

112

needed Banks' authorization for an evaluation to be conducted by The Rehabilitation Institute, although the letter did not mention The Rehabilitation Institute or include an authorization form, and Waters did not even know what The Rehabilitation Institute was going to do.

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

75. **On January 22, 2003, in an e-mail Henderson noted that Banks was continuing to call about returning to work and Henderson told Waters that she would no longer take Banks' calls but would [let] Waters know when she got them.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

76. **On February 28, 2003, Banks provided the medical authorization requested by Waters to communicate with Banks' ophthalmologist or optometrist and obtain related medical records**, but no one from Research Medical Center or The Rehabilitation Institute ever contacted Banks' eye doctor or conducted an independent eye examination.

Defendant admits that on February 28, 2003, Ms. Banks provided the medical authorization requested by Ms. Waters. Defendant objects to the balance of this proposed

113

fact as to materiality and on grounds that it is not supported by the evidence and is

misleading.

The evidence cited by Plaintiff that pertains to whether anyone from Research

Medical Center or The Rehabilitation Institute contacted Ms. Banks's eye doctor or

conducted an independent eye exam includes testimony from Ms. Banks' verified

statement:

> In February 2002, I signed an authorization permitting Lorraine
> Waters in Human Resources and RMC to access all medical records
> pertaining to my visual impairment and to request from my
> ophthalmologist, Dr. Roland Sabates of Stateline Eye Care, a summary
> report of findings and doctors' communications pertaining to my visual
> impairment. The authorization, as requested by Ms. Waters, did not seek
> an independent eye examination of me. The authorization was signed by
> me on February 28, 2003, and expired on May 28, 2003. Attached as
> Exhibit C-Banks is a true and correct copy of my February 28, 2003,
> authorization, the accuracy of which I affirm based on both my
> recollection and a verbal description of the attached document.
> To the best of my knowledge, information, and belief, no one from
> RMC or any other entity, including Rita Millner from the Rehabilitation
> Institute, ever contacted Dr. Sabates or Stateline Eye Care pursuant to the
> authorization attached as Exhibit C-Banks.

(Plaintiff's Exh. 5, ¶¶ 4, 5).  Plaintiff also cites the following testimony from Ms. Waters'

deposition:

> Q:    Do you have any independent knowledge that an independent
>        eyesight evaluation was ever conducted by a person licensed to
>        conduct a physical on behalf of the Rehabilitation Institute?
> A:    No.

(Plaintiff's Exh. 6, 90:21-25).

> Q:    And she eventually gave you authorization to do that, correct?
> A:    Yes.

114

Q:    Did you ever talk to her optometrist or ophthalmologist about her vision needs?

A:    I did not.

Q:    Why not?

A:    We have the Research Rehab Institute do that. That was what they did for us.

Q:    Okay. And are you aware of whether or not anyone at the Rehabilitation Institute ever talked to Jotina's ophthalmologist or optometrist?

A:    I'm not aware.

(Plaintiff's Exh. 6, 91:20-92:7).

Q:    And did you ever talk to anyone at State Line Eye Care or review documents from State Line Eye Care?

A:    No.

Q:    Did you ever request documents from State Line Eye Care?

A:    No.

Q:    What about Dr. Sabates, did you ever talk to anyone from his office or request records from his office?

A:    No.

Q:    What did you do with this authorization after you got it?

A:    It was forwarded to the Rehab Institute.

Q:    And you understood that they would be contacting State Line Eye Care and/or Dr. Roland Sabates?

A:    Yes.

Q:    And you don't know whether they ever did?

A:    No, I don't know.

(Plaintiff's Exh. 6, 108:9-109:5).

This evidence does not establish that Ms. Banks' eye doctor was not contacted by anyone at the Rehabilitation Institute. At best, it demonstrates that Ms. Waters did not know whether anyone from the Rehabilitation Institute did so. Ms. Banks' affidavit is similarly insufficient, as it lacks the personal knowledge required by Rule 56(e).

77.    **On March 13, 2003, five months after Banks had requested accommodations**

115

and three months after Fischer told Defendant that Banks could be accommodated,

**Waters retained Rita Millner of the Rehabilitation Institute to perform a task analysis of the unit secretary float pool position, but did not request an independent eye evaluation of Banks.**

Defendant admits that Rita Millner of the Rehabilitation Institute was hired by Research to perform a task analysis of the unit secretary float pool position. Defendant disputes the remainder of this proposed fact, stating it is not supported by the record, and further objects as to materiality and on the basis that the proposed fact is argumentative.

In support of this fact, Plaintiff cites testimony from Ms. Waters' deposition:

Q:   And it says, "On March 13, 2003, this specialist spoke with Ms. Lorraine Waters in Human Resources, outlining potential services. It was decided to initiate services with a task analysis of unit secretary-float pool, position." Do you see that?
A:   Yes.
Q:   When you had that meeting with her on March 13th was a task analysis the only thing you discussed that you wanted Ms. Mill[n]er to do?
A:   Yes.
Q:   You didn't ask her to do an independent eyesight evaluation?
A:   It was the task analysis.

(Plaintiff's Exh. 6, 148:5-18).

The undisputed facts show that Ms. Banks first requested accommodations in October of 2002. See Defendant's proposed fact number 49 and Plaintiff's proposed fact numbers 15, 31, 37, 56. The date on which Ms. Waters retained Ms. Millner, March 13, 2003, was approximately three months after that time. I, therefore find that portion of Plaintiff's proposed fact to be supported by the record.

116

Consistent with my reasoning in response to Plaintiff's proposed fact numbers sixty-six, sixty-seven, and seventy-three above, the evidence is disputed as to whether Mr. Fischer told Defendant that Ms. Banks could be accommodated or whether he said certain equipment would be used to determine if Ms. Banks could be accommodated. I, therefore, this portion of Plaintiff's proposed fact to remain controverted.

78. **Because Millner had no knowledge about adaptive equipment and technology for persons with visual impairments, her May 7, 2003, job task analysis referred the reader back to Dan Fischer, the caseworker who had performed a similar job task analysis five months earlier.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

79. **Waters had no concern that Millner was unfamiliar with adaptive equipment and technology available to persons with visual impairments.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

80. **According to Waters, Carolyn Logston, Director of Nursing, and Frankie Hagen, Director of Human Resources, took Millner's report into consideration in trying to fashion accommodations for Banks after Waters discussed the report with Hagen.**

117

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

81. **Waters never spoke to Millner or to anyone in nursing management about the report.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

82. **Hagen did not know about Millner's draft job analysis report or final job analysis report.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

83. **Logston never saw Millner's draft job analysis report or final report, did not discuss the report or its suggested accommodations with anyone, and never heard about any decision being made not to return Banks to work after Millner completed her report.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

84. **Henderson never saw Millner's final report.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

85. **Defendant never put Banks back in a unit secretary position for any period of time and has never scheduled Banks to work in any capacity again.**

Defendant does not dispute this fact.

86. **According to Waters, Defendant decided not put Banks back to work in a unit secretary position because of nursing management's safety concerns, even with the accommodations recommended by both Dan Fischer and Rita Millner.**

Defendant does not dispute this fact.

87. **Although Waters has received training on the Americans with Disabilities Act, she has no understanding that her employer is obligated to attempt reasonable accommodations to reduce or eliminate a direct threat related to an employee's disability.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

88. **Defendant's published Policy 100-100-10 on accommodating employees with disabilities includes employees with visual impairments and sets forth a list of possible reasonable accommodations such as making existing facilities readily accessible or usable, job restructuring, part-time or modified work schedules,**

119

**reassignment, acquisition or modification of equipment or devices, providing qualified readers or interpreters, changing assigned hours or days, redelegating or changing particular tasks or functions with another employee, providing auxiliary aids or personnel to assist the individual with a disability, changing work methods, and transferring to vacant positions.**

Defendant does not dispute this fact, but objects as to materiality. Defendant states that because Plaintiff's claim is brought under the ADA, it is irrelevant whether Defendant complied with its own internal policies. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

89.    **Defendant's policy also states that the reasonable accommodations listed in Section B.6, including reassignment, will be evaluated for the employee after a determination has been made that the employee cannot be accommodated in the currently-held position.**

Defendant does not dispute this fact, but objects as to materiality. Defendant states that because Plaintiff's claim is brought under the ADA, it is irrelevant whether Defendant complied with its own internal policies. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

90.    **Shortly after taking Banks off the schedule on October 26, 2002, and several**

120

weeks prior to Dan Fischer's task analysis of the unit secretary position on December 11, 2002, Henderson asked Banks how she felt about working in housekeeping, laundry, or the library, although Henderson never followed up with Banks on these suggestions.

Defendant does not dispute this fact.

91.   **Banks wondered why she should "go from a secretary to housekeeping" when she already had the unit secretary job and also was concerned about performing the functions of a housekeeper because of her deteriorating vision.**

Defendant does not dispute this fact.

92.   **Henderson did not have the authority to hire a housekeeper or the ultimate authority to make any hiring decision.**

Defendant does not dispute this fact, but objects as to materiality.  For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

93.   **In late November 2002, Henderson told Banks that she hoped to move her into a unit based unit secretary position within a couple of weeks, but Defendant never put Banks into a unit secretary or any other position.**

Defendant does not dispute this fact, but objects as to materiality.  For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

94.   **Henderson had heard about vacancies for part-time night shift unit**

121

**secretaries but never followed up with Banks about those positions because they were under different managers and Banks was expected to apply for such positions on her own and be accepted by those managers.**

Defendant admits this proposed fact in part, and objects that it is argumentative and mischaracterizes the record to the extent that it implies (1) Ms. Banks had no knowledge that transferring to another position, pursuant to hospital policy, required her to formally apply for such transfer and/or (2) Research did not assist Ms. Banks by providing to her listings of open positions and a job opportunities website allowing her to identify possible job options she desired.

In support of this fact, Plaintiff cites testimony from Ms. Henderson's deposition:

> Q:    Did you consider having Jotina come back in one of those part-
>        time night shift unit secretary positions that were vacant at least for
>        a time after you took her off the schedule?
> A:    No.
> Q:    Why not?
> A:    Because I didn't have control over those nighttime unit secretary
>        positions, those were under different managers.  She would have
>        had to apply for those positions and be accepted.

(Plaintiff's Exh. 4, 114:13-22).

The evidence cited by Plaintiff supports this proposed fact.  In response to Defendant's objections, I note that, consistent with Defendant's proposed fact number thirty-three, which was not disputed, Ms. Banks was aware that she was required submit an application to transfer to an open position.  I further note, consistent with Defendant's uncontroverted fact number sixty-three, which was likewise not disputed, that Defendant

122

provided Ms. Banks "with listings of open positions and a job opportunities website to allow her to identify other possible job options at Research."

95. **Sometime between November 2002 and early January 2003, Recruitment Manager Shawna Frazier and the other recruiters were told by Human Resources to look at possible clerical positions that would be a "fit" for Banks, including unit secretary, admitting, library, and PBX Operator.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

96. **The only information given to the recruiters was that Banks was a unit secretary in the float pool with poor vision that might lead to blindness and that she was not able to perform the duties of a unit secretary in the float pool even with accommodations**.

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

97. **Frazier did not know of any safety concern[s] related to Banks' visual impairment but did consider Banks' experience in different departments and areas in looking for possible positions.**

Defendant does not dispute this fact, but objects as to materiality. For the same

123

reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

98. **According to Frazier, she never found a position that was a "fit" for Banks although the recruiters had no information about Dan Fischer's job analysis and never contacted him to see how Banks could be accommodated as a unit secretary or in some other clerical position. Frazier never talked to any supervisors at any of the five Defendant facilities that met Banks' bus transportation needs about accommodation needs for Banks' vision.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

100. **Although Frazier knew early on about vacancies in admitting and the library, which she believed fit the criteria for Banks' accommodations and transportation needs, she did not follow up on them and does not know if other recruiters followed up on the jobs or ever talked to Banks about applying for those positions or to the supervisor of the admitting position.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

101. Frazier also heard about a vacant PBX Operator position but assumed that another recruiter had followed up on it.

124

Defendant disputes this fact, arguing it is not supported by the record.

In support of this fact, Plaintiff cites the following testimony from Mr. Frazier's

deposition:

> Q:  It says in your second sentence under February 19th, 2003, I see no
>      positions at this time that would be a fit for her, meaning Jotina
>      Banks, correct?
> A:  Correct.
> Q:  And if you had seen a position during that six-week period where
>      she didn't call and you didn't call her, would you have called her?
> A:  Yes, yes.
> Q:  Do you don't remember seeing a position anyway during that
>      period?
> A:  I don't.

(Plaintiff's Exh. 10, 62:19-63:5).

> Q:  (By Ms. Stith) So the two of [sic] you mentioned, admitting and
>      the library clerk position which was very early on in the process.
>      As far as you can recall, were those the only two positions that
>      were considered for her other than possibly the unit secretary job
>      she had held?
> A:  Correct.

(Plaintiff's Exh. 10, 81:4-11).

> Q:  You mentioned at the very beginning of the deposition there was a
>      PBX operator job considered for her.
> A:  I remember that was on the list as a vacant position.
> Q:  Do you remember where that vacancy occurred?
> A:  I do not.
> Q:  Was it one of the facilities closer to Research Medical Center?
> A:  I do not remember.
> Q:  Do you remember ever discussing PBX operator with Jotina?
> A:  I don't remember whether I did or not.  I don't remember.
> Q:  As you sit here today, the only two you recall were library clerk
>      and admitting clerk?
> A:  Those are the two that I remember.

(Plaintiff's Exh. 10, 99:4-20).

This evidence does not support Plaintiff's proposed fact. As a result, I find this fact to be controverted.

102. **Frazier never spoke to Banks again after January 6, 2003, or sent her a letter requesting Banks to call Frazier even though Frazier knew** about job openings that fit Banks' accommodations and transportation needs and also knew **that Banks, as compared to other employees seeking a transfer, needed more assistance in obtaining information on possible positions.**

Defendant admits that Ms. Frazier does not recall speaking to or otherwise communicating with Ms. Banks after January 6, 2003. Defendant objects to the remaining facts asserted as being misleading and mischaracterizing the record to the extent that they imply (1) Ms. Frazier knew about job openings after January 6, 2003, that "fit" Ms. Banks' needs, (2) Ms. Frazier provided Ms. Banks no assistance in obtaining information on possible positions available to Ms. Banks, and (3) Ms. Frazier was the only recruiter with whom Ms. Banks had contact.

The evidence cited by Plaintiff does not supported the disputed portion of this fact. To the contrary, Ms. Frazier testified "as far as a position that she wanted and was a fit for her in her mind, you know, I never found anything during that time or she would be in it." (Plaintiff's Exh. 10, 74:4-7). Defendant also cites evidence that Ms. Frazier did not see any positions that would fit Ms. Banks needs as of February of 2003 (Plaintiff's

Exh. 62:19-23). Only the portion of Plaintiff's proposed fact typeset in bold is uncontroverted.

103. **Frazier never spoke to Rita Millner or saw her May 2003 unit secretary job analysis report.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

104. Defendant has a practice of creating a new position when management wants one, as occurred when Henderson requisitioned management to create a new PRN/on-call unit secretary position under Henderson's supervision for Banks to fill.

Defendant disputes this fact, stating it is not supported by the record. Defendant also objects as to materiality.

In support of this proposed fact, Plaintiff cites the following evidence:

Q: So how did that come about that she came over there?
A: She came to me and asked me to go to work as a unit secretary p.r.n., that she wanted to work at Research Medical Center. I actually had to get an employee requisition signed to be able to hire her.

(Plaintiff's Exh. 4, 24:12-18).

Q: (By Ms. Stith) Is the requisition form you filled out, does that have a particular title, like I've see this EAW, employee action something or other. Is that what a requisition form looks like?
A: No.
Q: What does it say, if you remember, at the top?
A: It says Employee Requisition and you actually have to fill in the job title, the number of hours that you want, the qualifications, and

127

it has to be signed by myself, somebody from HR, the director of nursing and the CEO.

Q:    And so, she came and talked to you and you were able basically to get a position under your supervision created - -

A:    Yes.

Q:    - - that's an on-call unit secretary job?

A:    Yes.

Q:    And some just say p.r.n. and I understand that's the same thing - -

A:    Right.

Q:    - - in this context.

A:    Right.

Q:    What did you have to do besides the requisition form to get that position created for her, Jotina Banks?

A:    I'm not sure of the question.

Q:    Well, who did you go to with the requisition form or who did you send it to?

A:    My boss, Carolyn Logston.

Q:    Carolyn Logston was head of nursing?

A:    She was over the areas that I was - - she covered me, yes.

Q:    Do you remember what her title was?

A:    At the time it was director of nursing.

Q:    And then did you have anymore involvement in creating the position or did you just find out later it had been done?

A:    I just found out later it had been done.

(Plaintiff's Exh. 4, 25:20-27:12).

The evidence cited by Plaintiff does not support this proposed fact. I, therefore, find this fact to remain controverted.

**105.    According to Henderson, when Banks first approached her about transferring to a PRN/on-call unit secretary job in the float pool, the position did not even exist so Henderson filled out a job requisition to create the position, which management then approved.**

128

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

106. **Although Defendant's policy of reasonable accommodations permitted accommodations including job restructuring, auxiliary aids, modified or part-time work schedules, reassignment, and its practice permitted the creation of new positions, Defendant never returned Banks to work after her removal from the schedule on October 26, 2002, or even thought about doing it.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

107. **Although Banks remains on Defendant's eligible employee list and her last performance evaluation stated that attempts were being made to accommodate her vision "deficits/disability," Defendant has not thought about putting her back to work in any clerical position with accommodations.**

Defendant disputes this fact, stating it is not supported by the record. Defendant also objects as to materiality.

In support of this fact, Plaintiff cites the following evidence:

Q:    Let me show you what I've marked, I'll try to go through this one quickly, if I can, previously marked as Plaintiff's Exhibit 9. Have you had a chance to look at it?
A:    Yes.

129

Q:    Is this the annual performance review that you did for Jotina Banks
      for the year 3/19/93 to 3/19/04?
A:    Yes.
Q:    Is that your signature on the page - - I think it's the fifth page of the
      document, it's got a Bates stamp at the bottom 001024.
A:    Yes.
Q:    And did you write in the date 3/26/04 that you signed this?
A:    Yes.
Q:    Is that your appraiser comment handwritten in there?
A:    Yes.
Q:    And just - - did you again rate her as meeting expectations?
A:    Yes.
                         .   .   .
Q:    And under appraiser's comments you wrote "Jotina is currently
      inactive while attempts are being made to accommodate vision
      deficits/disability," do you see that?
A:    Yes.

(Plaintiff's Exh. 4, 92:18-93:23).


Q:    Do you know whether any of the accommodations or assistive
      equipment that Jotina suggested to Research were ever put into
      place for her to try in a position?
A:    As far as I know, they weren't.
Q:    So by "attempts" you don't mean that she was actually put in a
      position with certain accommodations?
A:    There was no position for a unit secretary to put her in that were
      [sic] unit based.
Q:    And as far as you know she wasn't put in any other clerical
      positions?
A:    As far as I know.
Q:    And did you just do this performance evaluation - - or why did you
      do this performance evaluation if she hadn't been there over a
      year?
A:    It's an requirement of every employee whether they're active or
      inactive and their raise is attached to that and it's just - - it's done
      on everything.

(Plaintiff's Exh. 4, 95:2-21).


130

Q:     And has Jotina Banks remained listed as an employee of Research
       since late October, 2002 till the present day?
A:     Yes.

(Plaintiff's Exh. 6, 81:10-13).

Q:     Do you remember being involved in a decision after Rehab Institute did some sort
       of report not to return Jotina Banks to the unit secretary job?
A:     I don't remember that.
Q:     Do you remember there ever being a decision not to return her with or without
       accommodations?
A:     I never heard an outcome like that, no.
Q:     And she's still on your employee list?
A:     Yes.
Q:     Have you thought about calling her to be scheduled?
A:     No.

(Plaintiff's Exh. 9, 66:19-67:9).

       The evidence cited by Plaintiff supports this proposed fact. Defendant does not

cite any evidence to the contrary. For the same reasons as those more fully stated in

response to Defendant's materiality objection to Plaintiff's proposed fact number one, I

also decline to strike this fact on that basis.

108.   **As a person with low vision, Banks could have performed the functions of the**

**position of unit secretary, both float pool and unit-based such as the position on 4**

**East, with mobility training, job coaching, and adaptive equipment such Zoom-text**

**software and two CCTVs, one at a desk top and the other a hand-held, battery-**

**operated TV.**

       Defendant disputes this fact, arguing it is not supported by the record.

       In support of this fact, Plaintiff cites, *inter alia*, the expert report of Keith Sofka:

131

B.        Unit Secretary - - Float Pool Accommodations for Low Vision

For low vision access, this position would require the use of two CCTV's. One would be a standard desktop type that would be used for the bulk of the stationary print access.  A second would be a hand-held battery operated type that would permit access at remote locations such as when doing the inventory, sending a fax or collecting charts.  In addition, a second camera would be attached to the main CCTV that would be mounted on a movable arm permitting it to be aimed at important items that required monitoring.  The call system is one possible use for this camera.  This would monitor the call lights and permit Ms. Banks to read the small print by each light.  An alternative system involving a removable template that has light detectors and larger labels and lights could be developed that would be mounted on the call lights to provide low vision access for this task.

Computer access would be through the use of Zoom Text or other software based screen magnification software.  Because of the "floating" nature of this position, this software would have to be installed by Ms. Banks before the start of each shift and removed at the end of each shift.  It may be possible to obtain permission to install this software at all locations for the cost of a single license since only one copy would be used at any given moment.  Similar arrangements have been made by this author with software producers in the past based upon similar circumstances.

Ms. Banks would have to have mobility training that would be designed to teach her methods for traveling throughout the hospital safely and reliably even with crowded hallways.  Mobility like this is possible for individuals who are blind after sufficient training and practice.  This is confirmed in the record by Ms. Bank's Rehabilitation Services for the Blind Counselor, Mr. Daniel Fischer and by this author's own experience working with individuals who are blind for about 25 years.

This author recommends that a job coach be utilized in the initial implementation phases for this job to assure quality and production are maintained during training and implementation of technology.

(Plaintiff's Exh. 11, Exhibit A, at p. 15).

132

Because this evidence supports Plaintiff's proposed fact, I find it to be uncontroverted.

109. **The May 7, 2003, unit secretary task analysis report, prepared for Defendant by Rita Millner of The Rehabilitation Institute, noted that some tasks could be readily accommodated for Banks, that others would require significant accommodations and/or job sharing/reallocation of duties, that various types of equipment for visual impairments exist on the market, that Rehabilitation Services for the Blind could provide training on the equipment, and that it would be helpful for Banks to try out various assistive devices "on the job."**

Defendant does not dispute this fact.

110. **There were vacancies for part-time Unit Secretaries on the night shift.**

Defendant admits that Ms. Henderson recalled two part-time unit secretary position on the night shift were vacant "at least for a time" after Ms. Banks was taken off the schedule.

111. **Millner's report, which Waters testified to reading, also recommended that, if Banks could not be fully accommodated as a unit secretary through technology and job sharing/reallocation of some tasks, other jobs to be considered for Banks includ[ing] greeter, phone operator/pager, and admission clerk.**

Defendant does not dispute this fact.

112. **As a person with low vision, Banks also could have performed the functions**

**of the positions of PBX Operator and Information Desk Receptionist with adaptive equipment such as a CCTV, optical character recognition software, a scanner, and a job coach, and, like Beverly Elaine Cook, she could have performed in another clerical position with appropriate adaptive equipment.**

Defendant does not dispute that Plaintiff's expert has opined that Ms. Banks could have performed the functions of the positions of PBX Operator and Information Desk Reception with accommodation. Defendant objects to this proposed fact to the extent it implies Ms. Banks requested reassignment to the position of PBX Operator and/or Information Desk Receptionist, as Ms. Banks neither requested reassignment to these positions or applied for these positions.

This fact is uncontroverted. In response to Defendant's objection, I note that, consistent with Defendant's proposed fact number thirty-three and Plaintiff's proposed fact number twenty-six, which are uncontroverted, an employee must make a written application for transfer. I also note that the undisputed facts do not demonstrate Ms. Banks ever applied for a transfer to the position of PBX Operator or Information Desk Receptionist. See Plaintiff's proposed fact numbers 50, 53.

113.  **In 2002 and 2003, there were clerical vacancies in admitting and the library which fit the criteria for Banks' accommodations and transportation needs.**

Defendant admits that vacancies in admitting and the library existed at some time during 2002 and 2003. Defendant objects to this proposed fact to the extent it implies

134

that Ms. Banks requested reassignment to such positions or that she applied for either position, inasmuch as it is undisputed that Ms. Banks did not.

This fact is uncontroverted. In response to Defendant's objection, I note that, consistent with Defendant's proposed fact number thirty-three and Plaintiff's proposed fact number twenty-six, which are both uncontroverted, an employee must make a written application for transfer. I also note that the undisputed facts do not demonstrate Ms. Banks ever applied for a transfer to clerical positions in admitting or the library. <u>See</u> Plaintiff's proposed fact numbers 50, 53.

**114.** **There also was a vacancy in the position of PBX Operator.**

Defendant does not dispute that PBX Operator was vacant at an unknown time. Defendant objects to this proposed fact to the extent that it implies that: (1) a position as PBX Operator was open at the time Ms. Banks requested assignment; (2) Ms. Banks requested reassignment to a PBX Operator position; or (3) Ms. Banks ever applied for a position as a PBX Operator. Defendant states that the record does not reflect that a PBX Operator position was open at the time Ms. Banks requested reassignment. It further states that it is undisputed that Ms. Banks did not request reassignment to a PBX Operator position or that she applied for a position as a PBX Operator.

This fact is uncontroverted. In response to Defendant's objections, I note that, consistent with Defendant's proposed fact number thirty-three and Plaintiff's proposed fact number twenty-six, which are both uncontroverted, an employee must make a written application for transfer. I also note that the  undisputed facts do not demonstrate Ms.

135

Banks ever applied for a transfer to the position of PBX Operator. See Plaintiff's proposed fact numbers 50, 53.

115. **In the past, Defendant permitted adaptive equipment, including a CCTV and a voice synthesizer, to be provided by Rehabilitation Services for the Blind to Beverly Elaine Cook, a 20-year Staff Development Assistant with deteriorating vision, who performed secretarial and administrative duties using adaptive equipment for low vision caused by macular degeneration and retinitis pigmentosa.**

Defendant does not dispute this fact, but objects as to materiality.

116. **Cook also provided her own equipment including a cane, markers, and crayons, and Defendant may have provided Cook with at least one piece of equipment.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

117. **After Cook began using the adaptive equipment for low vision in the mid-1980s, she safely and satisfactorily performed her job duties until she voluntarily left in late 2002 because of a non-work-related injury.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

118. **Sometime after May 2003, Jotina Banks became unable to read documents or**

136

**see even with CCTV magnification.**

Defendant does not dispute this fact.

119. **As a person with blindness, Banks can perform the functions of the positions of PBX Operator and Information Desk Receptionist with adaptive equipment such as a pressure mat noise detector, a motion detector, a voice-synthesizer, optical character recognition software, and, initially, a job coach.**

Defendant does not dispute that Plaintiff's expert opined that Ms. Banks can perform the functions of a PBX Operator and Information Deck Receptionist with accommodation. Defendant objects to this proposed fact to the extent that it implies Ms. Banks requested reassignment to either or these positions and to the extent that Ms. Banks ever applied for either of these positions, inasmuch as it is undisputed that she did not.

This fact is uncontroverted. In response to Defendant's objections, I note that, consistent with Defendant's proposed fact number thirty-three and Plaintiff's proposed fact number twenty-six, which are both uncontroverted, an employee must make a written application for transfer. I also note that the undisputed facts do not demonstrate Ms. Banks ever applied for a transfer to the position of PBX Operator or Information Desk Receptionist. See Plaintiff's proposed fact numbers 50, 53.

120. **The positions of PBX Operator and Information Desk Receptionist are**

137

**similar because both involve providing information to individuals on an as-needed basis and neither involves duties with safety concerns such as transcribing doctors orders, sorting medications, and carrying medical specimens.**

Defendant does not dispute this fact, but objects as to materiality. For the same reasons as those more fully stated in response to Defendant's materiality objection to Plaintiff's proposed fact number one, I also decline to strike this fact.

121. **Defendant considers Banks an employee who has not been called back to work and has described her as someone with vision "deficits/disability" for whom reasonable accommodations were being attempted**, yet Defendant has never attempted to accommodate her as a unit secretary or in any other clerical position.

Defendant does not dispute that Ms. Banks is an employee who has not been called back to work and that Research has described Ms. Banks "as someone with vision 'deficits / disability' for whom reasonable accommodations were being attempted." Defendant objects to the remainder of the proposed fact as to materiality and on grounds that it is argumentative and not supported by the record.

In support of this fact, Plaintiff cites, *inter alia*, testimony from Ms. Henderson's deposition:

> Q: What attempts were you aware of that were being made to accommodate her vision deficits/disability?
> A: I know that we had - - also had had [sic] an independent person come in to do a work study and evaluate her capabilities in her actual vision deficit.
>
> .   .   .

138

> Q:      Do you know whether any of the accommodations or assistive
>          equipment that Jotina suggested to Research were ever put into
>          place for her to try in a position?
>
> A:      As far as I know, they weren't.
>
> Q:      So by "attempts" you don't mean that she was actually put in a
>          position with certain accommodations?
>
> A:      There was no position for a unit secretary to put her in that were
>          unit based.

(Plaintiff's Exh. 4, 93:24-95:11).

The cited testimony reveals an apparent disagreement between the parties as to the meaning of "attempt to accommodate." Defendant believes it attempted to accommodate Ms. Banks by having an independent person perform a work study, while Plaintiff believes "attempt" means actually putting Ms. Banks in a position to ascertain whether certain accommodations would work. Due to this discrepancy, I find only the portion of this proposed fact typeset in bold to be uncontroverted.

## V.      *FAILURE TO ACCOMMODATE*

Failure to accommodate claims under the ADA involve a modified burden-shifting analysis. Canny v. Dr. Pepper, 439 F.3d 894, 900 (8th Cir. 2006). In order to make a *prima facie* case, a plaintiff must show

> (1) that she has a disability within the meaning of the ADA, (2) that she is
> qualified to perform the essential functions of her job, with or without
> reasonable accommodation, and (3) that she suffered an adverse
> employment action because of her disability.

Heaser, 247 F.3d at 830. Once a plaintiff makes a "facial showing that reasonable accommodation is possible, the burden of production shifts to the employer to show that it is unable to accommodate the employee." Benson, 62 F.3d at 1112 (emphasis in

139

original) (quoting Mason v. Frank, 32 F.3d 315, 318-19 (8th Cir. 1994)). "If the employer shows that the employee cannot perform the essential functions of the job even with reasonable accommodation, the employee must rebut that showing with evidence of [her] individual capabilities." Id. For purposes of this motion only, Defendant does not dispute that Ms. Banks has a disability within the meaning of the ADA or that she suffered an adverse employment action because of her disability; as a result, the sole question of whether Ms. Banks is a "qualified individual" remains.

### A. Qualified Individual

Under the ADA, "[t]he term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A court determines whether an individual is "qualified" based on a two-fold inquiry. Hatchett v. Philander Smith Coll., 251 F.3d 670, 674 (8th Cir. 2001). First, the court "must determine whether the individual meets the necessary prerequisites for the job, such as education, experience, and training." Id. If the first requirement is established, the court then focuses on "whether the individual can perform the essential job functions with or without reasonable accommodation." Id. This inquiry is made as of the time of the adverse employment action. Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1047 (8th Cir. 1999).

140

**1.** ***Does Ms. Banks Satisfy the Prerequisites for the Float Pool Secretary Position?***

Plaintiff must first establish that Ms. Banks meets the necessary prerequisites for the float pool secretary position. The record does not contain any uncontroverted facts that specifically address this issue. An individual can, however, satisfy this portion of the inquiry "by virtue of having previously held the position." Id. Here, it is uncontroverted that Ms. Banks worked as a float pool secretary for approximately three months (i.e., August through October of 2002). She had no difficulty working as a full-time unit secretary at Research since March 19, 2001. Several weeks after Ms. Banks was transferred to the float pool secretary position, she passed her annual competency requirements for handling blood-borne pathogens, hazardous materials, infectious waste, fire safety, electrical safety, back safety, emergency preparedness, and radiation safety. Defendant rated Ms. Banks as meeting expectations as a unit secretary and as a float pool unit secretary in 2002, 2003, and 2004. As a result, Plaintiff can satisfy the first requirement of this analysis.

**2.** ***Could Ms. Banks Perform the Essential Job Functions of Float Pool Secretary With or Without Reasonable Accommodation?***

As stated above, Plaintiff must show that Ms. Banks could perform her essential job functions with or without reasonable accommodation. The uncontroverted facts demonstrate that Ms. Banks could not perform the essential duties of a float pool secretary without accommodation at the time she is alleged to have suffered an adverse employment action, and Plaintiff does not argue to the contrary. That is, Ms. Banks was

removed from Defendant's work schedule on October 26, 2002. The uncontroverted

facts show that Ms. Banks began using self-provided adaptive equipment prior to July of

2002, and, by October of 2002, required additional adaptive equipment and software to

perform her unit secretary float pool position. The following analysis will, therefore,

focus on whether Ms. Banks was able to perform the essential duties of a float pool

secretary with reasonable accommodation.

**a.      Essential Job Functions**

Although an individual can rely on past performance to establish that she satisfies

the necessary prerequisites for the position, she cannot do so "to establish that she could

perform the essential functions of a job."  Id.  Instead, essential job functions are

established by:

> (1) the employer's judgment as to which functions are essential; (2)
> written job descriptions prepared before advertising or interviewing
> applicants for the job; (3) the amount of time spent on the job performing
> the function; (4) the consequences of not requiring the incumbent to
> perform the function; and (5) the current work experience of incumbents
> in similar jobs.

Heaser, 247 F.3 at 831.  The "employer's judgment in this regard is considered 'highly

probative.'"  Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 786 (8th Cir.

2004)(quoting Alexander v. The Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003)).

Summary judgment is appropriate when the employee cannot perform one or more of the

essential functions of his or her job with or without reasonable accommodation. Lloyd v. Hardin County, 207 F.3d 1080, 1084 (8th Cir. 2000).

In this case, the undisputed facts show that, as a float pool secretary, Ms. Banks could be stationed at any one of the hospital's ten or more unit secretary stations. Plaintiff must, therefore, show that Ms. Banks was able to perform the essential functions of an unit secretary at multiple locations. The parties agree that the essential functions of this position include: (1) responding to the patient call system, which entails notifying the appropriate individuals when a patient needs medical attention by reading call lights with small numbers that identify the room in which the patient in need of attention is staying; (2) processing documents like patient charges, medical records, doctors' orders and other forms; (3) creating patient charts by inputting information recorded on the patient board into the computer; (4) sorting and counting medication; (5) ordering supplies, which entails reading small writing on medications and medical equipment; (6) transporting samples of blood and bodily fluids; and (7) accurately transcribing doctors' orders. Having determined the essential job functions of a float pool secretary, I now consider whether Defendant could have reasonably accommodated Ms. Banks in this position.

**b.     Reasonable Accommodations**

"The term 'reasonable accommodation' means [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to

143

perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

Reasonable accommodations may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C.A. § 12111 (9).

"There is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it 'either imposes undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program.'" Buckles v. First Data Res., Inc., 176 F.3d 1098, 1101 (8th Cir. 1999)(quoting DeBord v. Bd. of Educ., 126 F.3d 1102, 1106 (8th Cir. 1997)). It is well settled, however, that an employer is not obligated "to reallocate the essential functions of a position that a qualified individual must perform" or "hire additional employees or reassign existing workers" to assist the individual with her essential duties. Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 788 (8th Cir. 1998). The employee must inform her employer that an accommodation is needed, although such request need not contain any "magic words." Lowery v. Hazelwood Sch. Dist., 244 F.3d 654, 660 (8th Cir. 2001).

144

i. Adaptive Equipment

The record contains conflicting evidence concerning whether accommodations would have allowed Ms. Banks to perform the essential functions of this position. It is undisputed that Ms. Banks: (1) testified that even with accommodation, it would be very difficult or impossible for her to read the patient board; (2) testified she did not believe she could sort medication safely; (3) told Mr. Fischer that counting medication, even with an accommodation, would be difficult; (4) stated if she worked as a unit secretary, someone else would have to sort and count medications; (5) was concerned about her ability to order unit supples and believed someone else would have to perform that function; (6) was concerned about patient safety because, due to her deteriorating vision, she might not be able to correctly match a blood sample to an appropriate patient; (7) felt she could not safely transport bodily fluids; and (8) did not know of any adaptive equipment that would enable her to read handwritten doctors' orders. Ms. Banks' admissions that someone else would have to sort/count medications and order unit supplies are of particular interest, as the ADA does not require Defendant to reassign existing workers to assist Ms. Banks with her essential duties.

However, the record contains differing evidence about whether adaptive equipment would have allowed Ms. Banks to perform these duties. Mr. Fischer's testimony that Ms. Banks could have performed all unit secretary functions with accommodations remains disputed. It is undisputed, though, that Mr. Fischer recommended a thirty- to sixty-day trial period during which Ms. Banks could try the

145

equipment he suggested. Additionally, Ms. Millner concluded that there were "some significant issues/barriers to Ms. Banks' ability to perform all aspects of the Unit Secretary Float Pool" position; "While some tasks could be readily accommodated, it is felt that others will require significant accommodations and/or job sharing/reallocation of duties." Importantly, Ms. Millner does not conclude that there were tasks that could only be accommodated by reallocation. My own review of this report reveals that when addressing the job functions of sorting medications and ordering unit supplies, Ms. Millner suggested both portable visual aides and job sharing/reallocation as possible accommodations. Like Mr. Fischer, to whom she defers on adaptive equipment, Ms. Millner suggests a trial period to determine the devices that worked best for Ms. Banks.

Plaintiff also advances the uncontroverted testimony of its own expert retained for purposes of this litigation that Ms. Banks could have performed the essential functions of a float pool secretary with "mobility training, job coaching, and adaptive equipment such as Zoom-text software and two CCTVs, one at a desk top and the other a hand-held, battery-operated TV." Defendant argues that (1) neither Ms. Banks nor Mr. Fischer suggested a hand-held battery-operated CCTV as an accommodation during the relevant time period and (2) Plaintiff did not offer any evidence Defendant should have known about such an accommodation. In addition to the mention of portable visual aides in Ms. Millner's report, Ms. Banks also provided a list of adaptive equipment to Mr. Davidson in

146

November of 2002 that included portable CCTVs.[3]  Although it is unclear from the record

whether Ms. Banks specifically discussed the portable CCTV with Mr. Davidson, its

inclusion in the literature gives rise to an inference that it was, at least, suggested.

Plaintiff has thus made a facial showing that reasonable accommodations were possible

and the burden of production now shifts to Defendant to show that it was unable to

accommodate Ms. Banks.

Defendant makes no such showing.  Both parties focus heavily on the issue of

whether RSB could have provided free accommodations for multiple work stations.  The

record as composed for purposes of summary judgment does not, however, contain any

evidence that the equipment could not have been obtained by other means.  Specifically,

there is no evidence indicating how much the proposed accommodations would have

cost.  Even if Defendant would have been forced to purchase the equipment on its own, it

does not show that doing so would have been cost prohibitive or would impose an undue

financial burden.  Accordingly, summary judgment on this basis is denied.

Direct Threat

The ADA allows employers to require that an individual not pose a "direct threat

to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).

"The term 'direct threat' means a significant risk to the health or safety of others that

---

[3]Exhibit thirty-four to Mr. Davidson's deposition, as referenced in Plaintiff's uncontroverted fact number thirty-nine, shows that Ms. Banks gave him literature concerning portable CCTVs.  See Plaintiff's Exh. 7, Depo. Exh. 34, at 000061.

147

cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

Determination of whether an individual poses a "direct threat" must be based

"on an individualized assessment of the individual's present ability to safely perform the

essential functions of the job. This assessment shall be based on a reasonable medical

judgment that relies on the most current medical knowledge and/or the best available

objective evidence." 29 C.F.R. § 1630.2. The following factors must be considered in

making such a determination: (1) The duration of the risk; (2) The nature and severity of

the potential harm; (3) The likelihood that the potential harm will occur; and (4) The

imminence of the potential harm." 29 C.F.R. § 1630.2.

Plaintiff and Defendant disagree as to which party bears the burden of proving

Ms. Banks could safely perform the essential functions of the float pool secretary

position. A split in authority currently exists amongst the circuits, and the Eighth Circuit

has not yet decided this issue. Upon review of the statutory scheme of the ADA, the

legislative history surrounding creation of the direct threat defense, and existing

decisional law, I conclude that the burden belongs to Defendant.

Authority allowing an employer to impose a qualification standard that an

employee not pose a direct threat to the health and safety of others in the workplace is

found within the "Defenses" section of the ADA. 42 U.S.C. § 12113. The House

Judiciary Report explains that an otherwise qualified applicant "cannot be disqualified on

the basis of a physical or mental condition unless the <u>employer</u> can demonstrate that the

applicant's disability poses a direct threat to others in the workplace. The plaintiff is not

148

required to prove that he or she poses no risk." H.R. Rep. No. 101-485(III), at 36 (1990), reprinted in U.S.C.C.A.N. 445, 469 (emphasis added). In 2002, the United States Supreme Court also recognized "direct threat" as an affirmative defense. Chevron v. Echazabal, 536 U.S. 73, 78 (2002).

Despite this authority and the general proposition that defendants bear the burden of raising and proving affirmative defenses, several courts have held that where performance of essential job functions implicates the safety of others, the plaintiff must prove she can perform such functions in a way that does not endanger others. See, e.g., McKenzie v. Benton, 388 F.3d 1342, 1355-56 (10th Cir. 2004); Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1295 (10th Cir. 2000); EEOC v. Amego, Inc., 110 F.3d 135, 144 (1st Cir. 1997); Moses v. Am. Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996); Robertson v. Neuromedical Ctr., 983 F. Supp. 669, 674 (M.D. La. 1997).

Although the Eighth Circuit has only addressed which party bears the burden in a dissent, see Stafne v. Unicare Homes, 266 F.3d 771, 779 (8th Cir. 2001) (Lay, J., dissenting)(stating the employer "must carry the burden of proof that the individual poses a direct threat to the safety of those in the workplace"), at least one district court within the circuit has considered the issue. In McClean v. Case Corp., Inc., a plaintiff who worked operating heavy machinery was diagnosed with multiple sclerosis. 314 F. Supp. 2d 911, 915 (D. N.D. 2004). His employer became concerned that he posed a safety threat and placed him on short-term disability. Id. at 916. In granting summary judgment for the employer, the District of North Dakota held, "Once an employee presents a *prima*

149

*facie* case of discrimination, the burden shifts to the employer to present a legitimate business reason for its decision, which includes the reason that the employee posed a 'direct threat.'" Id. at 919-20 (citations omitted).

In find these cases, as well the reasoning contained in the opinions of other circuits, to be persuasive. See, e.g., Echazabal v. Chevron USA, Inc., 336 F.3d 1023, 1027 (9th Cir. 2003); Hargrave v. Vermont, 340 F.3d 27, 35 (2d Cir. 2003); Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884, 893 (9th Cir. 2001); Hamlin v. Charter Township of Flint, 165 F.3d 426, 431 (6th Cir. 1999); Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999); Rizzo v. Children's World Learning Ctr., Inc., 84 F.3d 758, 764 (5th Cir. 1996); EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1283 (7th Cir. 1995); EEOC v. Union Pac. R.R., 6 F. Supp. 2d 1135, 1138 (D. Idaho 1998). Accordingly, Defendant must prove that, as a float pool secretary, Ms. Banks posed a direct threat to the safety of individuals at Research Medical Center.

The record does not contain any uncontroverted facts suggesting Defendant based its determination that Ms. Banks posed a "direct threat" on current medical knowledge or on the best available objective evidence. Ms. Banks voiced concern regarding her ability to safely sort medications and transport blood and other bodily fluids. However, as discussed above, Section V(A)(2)(b)(i), it remains disputed whether these concerns could have been eliminated by reasonable accommodation. Moreover, Ms. Banks' testimony is not the current medical knowledge or objective evidence contemplated by the regulations. The uncontroverted facts do not indicate that a doctor or any of the experts concluded Ms.

150

Banks' vision deficit presented a safety risk that could not be eliminated by reasonable accommodation. Despite Ms. Waters' testimony that Carolyn Logston, Director of Nursing, expressed safety concerns about returning Ms. Banks to a unit secretary position even with the equipment and training accommodations recommended by Mr. Fischer and Ms. Millner, Ms. Logston testified she did not recall any conversations or concerns about safety. Even if such conversations did occur, the record before me does not identify the facts that informed Ms. Logston's opinion. Summary judgment on this basis is, therefore, denied.

### ii. Reassignment

Reassignment to a vacant position is also a possible accommodation under the ADA. Benson, 62 F.3d at 1114. Reassignment is an "accommodation of last resort," however, only arising when "accommodation within the individual's current position would pose an undue hardship." See Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1019 (8th Cir. 2000)(quoting 29 C.F.R. § 1630.2(o)); see also Nagel v. Sykes Enter., Inc., 383 F. Supp. 2d 1180, 1195 (D. N.D. 2005). To prevail, an employee must first establish that the position sought is vacant and that she is qualified to hold the position. Cravens, 214 F.3d at 1019; Nagel, 383 F. Supp. 2d at 1195. "The term 'vacant position' not only includes positions that are presently vacant, but also those that the employer reasonably anticipates 'will become vacant in a short period of time.'" Cravens, 214 F.3d at 1019 n.5 (quoting Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1187 (6th Cir. 1996)); Nagel, 383 F. Supp. 2d at 1195 n.10. An employer does not

151

remain obligated to reassign a disabled employee who remains listed on its employee roster when there are not any vacant jobs or a likelihood that a position would become available in the near future.  See Nagel, 383 F. Supp. 2d at 1195 (granting summary judgment on issue of reassignment where employee "offered no evidence to suggest there were any vacancies . . . or that vacancies would become available in the near future"); see also Kalskett v. Larson Mfg. Co. of Iowa, Inc., 146 F. Supp. 2d 961, 981 (N.D. Iowa 2001).

Factual disputes prevented summary judgment with respect to whether Defendant could have accommodated Ms. Banks as a float pool secretary with adaptive equipment; however, should the jury resolve these disputes in favor of Defendant, the possibility of reassignment must be discussed.  Here, Defendant informed Ms. Banks that she could not be accommodated as a float pool secretary on November 25, 2002.  Plaintiff states that, thereafter, Ms. Banks contacted Defendant many times about returning to work as a unit secretary, answering phones, being a receptionist, or doing some other work.  She requested reassignment to other clerical positions such as receptionist and answering the phones during a period of time when Defendant had clerical vacancies - including a vacancy for a PBX Operator.  Plaintiff advanced evidence that, during the relevant time, Defendant also had vacancies in admitting, the library, and for part-time unit secretary positions.  Ms. Banks was qualified to perform the essential functions of PBX Operator and Information Desk Receptionist.

However, Defendant has a policy that requires employees to submit a written transfer application in order to be placed in another position.  See Braziel v. Loram Maint. of Way, Inc., 943 F. Supp. 1083 (D. Minn. 1996) (stating "employee's failure to formally apply for a position barred her from establishing a *prima facie* case").[4]  Banks was aware of this policy.  The uncontroverted facts show that Ms. Banks only applied for positions as a Medical Office Specialist and a Patient Accounts Representative.  Although not explicitly stated, it appears that Patient Accounts Representative position was vacant since Ms. Banks was interviewed; the uncontroverted facts do not show Defendant had an open Patient Accounts Representative position.  Moreover, Plaintiff does not offer any evidence that Ms. Banks was qualified to perform either of these positions.  Therefore, Defendant's motion for summary judgment as to reassignment is granted.[5]

## B.  Interactive Process

The interactive process is triggered once an employee requests accommodations.  See Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 952 (8th Cir. 1999).  Once the process has been initiated, the parties must work together in good faith to determine what accommodations are necessary.  Nagel, 383 F. Supp. 2d at 1193.

---

[4]"Because the same basic standards and definitions are used under both [the ADA and the Rehabilitation Act], cases interpreting either are applicable and interchangeable for purposes of our discussion."  Allison v. Dep't of Corr., 94 F.3d 494, 497 (8th Cir. 1996).

[5]Defendant argues that Ms. Banks rejected its offer of reassignment to a full-time housekeeping position.  The uncontroverted facts do not show, however, that such an offer was ever made.

153

### 1. *Did Defendant Participate in the Interactive Process in Good Faith?*

In order to prove that an employer failed to participate interactive process, an employee must demonstrate:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Fjellestad, 188 F.3d at 952 (quoting Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 165 (3d Cir. 1999). "Although an employer will not be held liable under the ADA for failing to engage in an interactive process if no reasonable accommodation was possible, . . . for purposes of summary judgment, the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is *prima facie* evidence that the employer may be acing in bad faith." Id.

In this case, analysis of these four factors reveal that a summary judgment is only appropriate in part. First, Defendant learned of Ms. Banks' disability in October of 2002, when Ms. Banks told Ms. Henderson she could no longer perform her job as float pool secretary without adaptive equipment. Second, Ms. Banks requested adaptive equipment and software, such as Zoom text, a CCTV, and JAWS for Windows that same month, thus triggering the interactive process.

The respective evidence offered in support of the third factor demonstrates that a factual dispute exists concerning whether Defendant made a good faith effort to assist Ms. Banks in seeking accommodations. Defendant maintains that it fulfilled this duty.

154

After learning of Ms. Banks' disability in late October of 2002, Defendant met with Ms. Banks' vocational rehabilitation counselor, Mr. Fischer, in November of 2002 and continued to work with him through December of 2002. On December 11, 2002, Defendant met with Mr. Fischer to perform a two-hour job task analysis. Upon obtaining Ms. Banks' executed medical authorization, Defendant hired Rita Millner of The Rehabilitation Institute to conduct a second task analysis to assess Ms. Banks' limitations and possible accommodations. During this period of time, Defendant provided Ms. Banks with listings of open positions and a job opportunities website to allow her to identify other possible job options; it had difficulty contacting Ms. Banks by telephone as her telephone had been disconnected. Defendant also offered to read newly-posted job vacancies to Ms. Banks over the telephone or in person, and told her it would assist her in filling out transfer applications.

By contrast, Plaintiff takes the position that Defendant did not exercise good faith, stating Defendant decided early on not to accommodate Ms. Banks as a float pool secretary and declining to reassign her to a vacant clerical positions. By October 31, 2002, Ms. Henderson concluded that Ms. Banks could not be accommodated in the unit secretary float pool position and informed Ms. Waters as such, even though Ms. Henderson had not yet conducted a job analysis of the position for a low-vision employee requesting accommodations. Ms. Banks gave Ms. Henderson a list of the equipment she needed in mid-October of 2002, but that Ms. Henderson never discussed the list with her. On November 12, 2002, Ms. Banks met with Steve Davidson in Human Resources to

155

discuss what type of adaptive equipment she needed and went over the list with him. Ms. Henderson told Ms. Waters again on November 21, 2002, that Ms. Banks could not be accommodated in the unit secretary float pool position. Ms. Henderson shared this conclusion with Ms. Banks on November 25, 2002, but stated she hoped to find an unit-based position for Ms. Banks within weeks. When Ms. Henderson spoke to Mr. Davidson in early December about Ms. Banks she said, "We don't have a place for her do we[?]".

After Mr. Fischer's work site analysis on December 11, 2002, Ms. Henderson told him they would contact him and Ms. Banks after an opening was identified. Defendant never contacted Mr. Fischer, though, and Mr. Fischer concluded that Defendant was not interested in proceeding with his recommendations for work station modifications. Additionally, Defendant did not make an effort to start the thirty- to sixty-day trial period for Ms. Banks with the equipment and training as recommended by Mr. Fischer. In a January 22, 2003, e-mail, Ms. Henderson informed Ms. Waters that Ms. Banks was continuing to call about returning to work and although she would no longer take the calls, Ms. Henderson would alert Ms. Waters when she received them. Although Defendant requested Ms. Banks undergo an independent eye evaluation so it could better evaluate possible accommodations, it never scheduled an evaluation. After Ms. Millner prepared the report based upon her task analysis, Ms. Waters did not talk to Ms. Millner, anyone in nursing management, or the director of Human Resources about the report.

156

Defendant's recruitment manager, Shawna Frazier, stated she did not follow up with Ms. Banks about vacant positions in admitting and the library that she believed fit the criterion for Ms. Banks' accommodation and transportation needs. She did not know if other recruiters followed up on these jobs or talked to Ms. Banks about applying. Ms. Frazier neither spoke to Ms. Banks after January 6, 2003, nor sent her a letter requesting Ms. Banks call her even though she knew Ms. Banks needed more assistance than other employees obtaining information about possible positions.

Despite the factual dispute on the third factor of the analysis, Plaintiff must still be able to prove Ms. Banks could have been reasonably accommodated but for Defendant's purported lack of good faith in order to survive summary judgment. As discussed *supra*, Sections V(A)(2)(b)(i) and V(A)(2)(b)(ii), Ms. Banks requested both adaptive equipment and reassignment to another position. I found that a factual dispute existed concerning whether Ms. Banks could have been accommodated as a float pool secretary with adaptive equipment; the disputed facts about Defendant's participation in the interactive process directly address the way in which it investigated such accommodations. By contrast, Ms. Banks' unsuccessful request for reassignment appears to have resulted from her own failure to apply for vacant positions for which she was qualified, and none of the disputed facts on the interactive process issue pertain to the two positions for which she did apply. Summary judgment is, consequently, denied with regard to Defendant's participation in the interactive process subsequent to Ms. Banks' request for adaptive equipment and granted with respect to her request for reassignment.

157

### 2. Did Ms. Banks Participate in the Interactive Process in Good Faith?

Just as summary judgment may be appropriate where an employer fails to engage in the interactive process in good faith, it may also be appropriate if the employee fails to make a good faith effort. See Nagel, 383 F. Supp. 2d at 1193. "A party that obstructs or delays the interactive process is not acting in good faith." Id. Likewise, "[a] party that fails to communicate, by way of initiation or response, may also be acting in bad faith." Id.

Here, Defendant contends that Ms. Banks "sabotaged" the interactive process by "working to thwart and delay its efforts" to identify potential accommodations. In December of 2002, Defendant asked Ms. Banks for an authorization allowing it to discuss her visual impairment and any needed accommodations with her treating optometrist/ ophthalmologist. Ms. Banks signed an authorization in late December of 2002 or early January of 2003 for her own attorneys and, on January 30, 2003, instructed her RSB case worker, Mr. Fischer, not to release any of her medical records to Defendant without her written approval. She did not provide an executed medical authorization to Defendant until February 28, 2003. Moreover, although Defendant provided Ms. Banks with listings of open positions and offered to help her fill out transfer applications, Ms. Banks only applied for two positions - Medical Office Specialist in August of 2003 and Patient Accounts Representative in February of 2004. Ms. Banks stated she did not apply for jobs in 2003 and 2004 because she was under the care of a psychiatrist and was not focused. She also testified that part of the reason she did not apply for other positions

158

was because she believed Defendant could accommodate her as a float pool secretary, as her "vision was not that bad," and she could still perform her job effectively with adaptive equipment.

Plaintiff's uncontroverted facts demonstrate, however, that Ms. Banks did act in good faith. Ms. Banks signed authorizations on October 18, 2002, and November 18, 2002, permitting Mr. Fischer to discuss her disability, accommodations, and medical and vocational issues relating to her job retention. On November 12, 2002, Ms. Banks met with Steve Davidson in Defendant's Human Resources Department to discuss what type of adaptive equipment she needed and went over a list of adaptive equipment that she had provided to him. In both March and May of 2003, Ms. Banks met with Rita Millner of The Rehabilitation Institute, the entity Defendant retained in March of 2003 to prepare a job task analysis. Ms. Banks also took refresher training classes in 2003 and 2004 in order to stay eligible on Defendant's employee list.

Although Ms. Banks did not execute a medical authorization for Defendant promptly after being asked to do so, she ultimately did provide Defendant with such an authorization. The facts offered by Plaintiff also indicate that Ms. Banks also took other actions after the interactive process was triggered to help Defendant determine whether reasonable accommodations were possible. Accordingly, Plaintiff has created a genuine issue of fact as to whether Ms. Banks participated in the interactive process in good faith regarding adaptive equipment. Summary judgment on this basis is denied. Again, Ms. Banks was not reassigned to another position because she failed to apply for vacant

159

positions for which she was qualified, therefore making summary judgment proper on Ms. Banks' role in the interactive process with respect to reassignment.

## C. Ms. Banks' Allegedly Inconsistent Statements Concerning her Ability to Work

An employee's application for social security disability insurance benefits wherein she represents that she is unable to work due to disability does not automatically preclude suit under the ADA. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 979 (1999); see also Voeltz v. Arctic Cat, Inc., 406 F.3d 1047, 1050 (8th Cir. 2005). To maintain a successful suit, however, the applicant "must 'proffer a sufficient explanation" for the 'apparent contradiction'" between not being able to work (for purposes of social security disability insurance benefits) and being a "qualified individual" (for purposes of a reasonable accommodation claim under the ADA). Id. (quoting Cleveland, 526 at 806). Absent such an explanation, "prior representations of total disability will generally carry sufficient weight to grant summary judgment against the plaintiff." Lloyd v. Hardin County, 207 F.3d 1080, 1083 (8th Cir. 2000) (quoting Dush v. Appleton Elec. Co., 124 F.3d 957, 963 (8th Cir.1997)).

Here, Plaintiff offers the necessary explanation. Ms. Banks applied for social security disability benefits in July of 2002, stating that she had been unable to work since March of 2000. She put the year "2000" as the date of onset because a Social Security employee told her to list the date on which her condition started. However, the uncontroverted facts also show that, prior to July of 2002, Ms. Banks began using hand-

160

held magnifiers and a 20/20 pen to perform her job. She was able to perform both as unit secretary and as float pool secretary with this equipment until approximately October of 2002, at which time she told Ms. Henderson she was concerned that she could no longer do her job without additional adaptive equipment. Not until sometime after May of 2003 could Ms. Banks no longer read documents or see with CCTV magnification. Because, as opposed to under the ADA, a social security benefits applicant does not even have "to refer to the possibility of reasonable accommodation when she applies," Cleveland, 526 U.S. at 803, Ms. Banks' position for purposes of the instant suit that she could perform the essential job functions of a float pool secretary is not inconsistent with her statement to the Social Security Administration that disability rendered her unable to work. Defendant's motion for summary judgment is denied on this ground.

## VI.     CONCLUSION

Based on the above findings of undisputed facts and the law discussed in Section V, I find that genuine issues of material facts do not exist regarding Ms. Banks' request for reassignment and both Defendant and Ms. Banks' participation in the interactive process with respect to Ms. Banks' request for reassignment. Defendant is entitled to summary judgment as a matter of law on these issues. I also find that because genuine issues of material fact still exist on Plaintiff's request for adaptive equipment, the parties' subsequent participation in the interactive process, and Ms. Banks' statements of disability, summary judgment on these issues is not appropriate.

161

Therefore, it is

ORDERED that Defendant's Motion for Summary Judgment is granted in part and denied in part.

/s/ Robert E. Larsen
_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 31, 2006

Case 4:04-cv-00883-REL   Document 114   Filed 07/31/06   Page 162 of 162